UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

IN RE SUBPOENA DIRECTED TO        )    NO._____
EPSILON INVESTMENT MANAGEMENT     )
L.L.C.                            )

## DECLARATION OF NICK SOLANDROS IN SUPPORT OF EPSILON INVESTMENT MANAGEMENT L.L.C.'S MOTION TO QUASH

Nick Solandros hereby affirms and declares as follows:

1.      I am over the age of twenty-one years, am competent to testify in this matter, and have personal knowledge of the items set forth in this declaration.

2.      I am a paralegal for Monahan & Biagi, P.L.L.C., a Seattle law firm.  I make this declaration in that capacity.

3.      Monahan & Biagi, P.L.L.C. is general counsel for Epsilon Investment Management L.L.C. ("Epsilon").   Whenever Epsilon is served with process through its registered agent in Delaware (National Registered Agents, Inc. of Dover, Delaware), the registered agent immediately notifies Monahan & Biagi, P.L.L.C. by telephone and then forwards the law firm all served papers by overnight courier.

4.      Attached as **Exhibit 1** is a true and accurate copy of a transmittal form and a Subpoena In A Civil Case (with all attachments), served on Epsilon's Delaware registered agent on April 27, 2006, and which Monahan & Biagi, P.L.L.C. received from the registered agent by Federal Express on April 28, 2006.  I confirmed with the registered agent that no Fed.R.Civ.P. 30(b)(6) Notice of Deposition or other attachment to the Subpoena In A Civil

Case designating matters for which examination is sought was included as part of the documents served on Epsilon's Delaware registered agent.

I declare the foregoing to be true and correct to the best of my knowledge and belief under penalty of perjury under the laws of the State of Washington, the State of Delaware, and the United States.

SIGNED this 10th day of May, 2006.

_____
Nick Solandros

# EXHIBIT 1

# NATIONAL REGISTERED AGENTS, INC.

## SERVICE OF PROCESS SUMMARY TRANSMITTAL FORM

To:  JOHN M. MONAHAN
MONAHAN & BIAGI, P.L.L.C.
701 5TH AVE., SUITE 2800
SEATTLE, WA 98104-7003·

SOP Transmittal # DE25139

(800) 767-1553 - Telephone
(609) 716-0820 - Fax

Defendant: EPSILON INVESTMENT MAMAGEMENT L.L.C.
(Entity Served)

Enclosed herewith are legal documents received on behalf of the above captioned entity by National Registered Agents, Inc. or its Affiliate in the State of    DELAWARE    on this   27   day of    April    ,   2006   . The following is a summary of the document(s) received:

1.    Title of Action: TALISMAN CAPITAL TALON FUND, LTD. VS. RUDOLF W. GUNNERMAN AND SULPHCO, INC.

2.    Document(s) served:

| | | |
|---|---|---|
| __ Summons | X Subpoena | __ Injunction |
| __ Complaint | __ Third Party Complaint | __ Notice of |
| __ Petition | __ Demand for Jury Trial | __ Mechanics Lien |
| __ Garnishment | __ Default Judgement | __ Other: |

3.    Court of Jurisdiction/    UNITED STATES DISTRICT COURT, DISTRICT OF DELAWARE
Case & Docket Number:  CV-N-0354-BES-RAM

4.    Amount Claimed, if any: N/A

5.    Method of Service (select one):
X Personally served by:    X Process Server    __ Deputy Sheriff    __ U. S Marshall
__ Delivered Via:    __ Certified Mail    __ Regular Mail    __ Facsimile
(Envelope enclosed)    (Envelope enclosed)
__ Other (Explain):

6.    Date and Time of Service: 4/27/2006 3:39:41 PM EST (GMT -5)

7.    Appearance/Answer Date: MAY 15, 2006 @ 10:00 AM

8.    Plaintiff's Attorney:    T. MICHAEL GUIFFRE, ESQ
(Name, Address & Telephone Number)    PATTON BOGGS LLP
2550 M STREET, NW
WASHINGTON D.C. 20037
202-457-6000

9.    Federal Express Airbill #790410046836

10.  Call Made to: NICK SOLANDROS

11.    Special Comments:
ATTORNEY FOR DEFENDANTS

NATIONAL REGISTERED AGENTS, INC.    Copies To:

Transmitted by: Debbie Sealund

The information contained in this Summary Transmittal Form is provided by National Registered Agents, Inc. for informational purposes only and should not be considered a legal opinion. It is the responsibility of the parties receiving this form to review the legal documents forwarded and to take appropriate action.

ORIGINAL

# UNITED STATES DISTRICT COURT

### DISTRICT OF DELAWARE

Talisman Capital Talon Fund, Ltd.

### Plaintiff

v.

Rudolf W. Gunnerman and SulphCo, Inc.

### Defendants.

## SUBPOENA IN A CIVIL CASE

CASE NUMBER: **CV-N-0354-BES-RAM**

pending in the United States District Court for the District of Nevada, Reno Division

TO:     **Epsilon Investment Management L.L.C.**
c/o National Registered Agents, Inc.
160 Greentree Drive Suite 101
Dover, DE 19904

☐    YOU ARE COMMANDED to appear in the United States District Court at the place, date and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☒    YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION<br>Proctor Heyman LLP<br>1116 West Street<br>Wilmington, DE 19801 | DATE AND TIME<br>May 17, 2006 at 10:00 a.m. local time |
|---|---|

☒    YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

See Attachment "A"

| PLACE<br>Proctor Heyman LLP<br>1116 West Street<br>Wilmington, DE 19801 | DATE AND TIME<br>May 15, 2006 at 10:00 a.m. local time |
|---|---|

☐    YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of deposition shall designate one or more officers, directors or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)<br><br>T. Michael Guiffré w/ Effusi<br>Attorney for Defendants | DATE<br><br>04/26/2006 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

T. Michael Guiffré, Esquire
Patton Boggs LLP
2550 M Street, NW
Washington D.C. 20037
(202) 457-6000

4799637v1

NOTE - If the place of travel is more than 100 miles (by the shortest usual means of travel) from the place where the subpoena is served, or if the place of deposition is more than 100 miles from the place where the deponent resides, is employed or transacts business in person, the person served may regard the command as optional unless there is attached to the subpoena an order of the Court requiring his/her appearance, notwithstanding the distance of travel. In any event, response to the subpoena will entitle the person to the fees and mileage allowed by law.

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

☐ Fees tendered for one day's attendance and mileage allowed by law.
(Fees and mileage need not be tendered when the subpoena is issued on behalf of the United States or an officer or agency thereof.)

## DECLARATION OF SERVICE

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the proof of Service is true and correct.

Executed on _____
            DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

RULE 45.

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and reasonable attorney's fees.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court shall quash or modify the subpoena if it
(i) fails to allow reasonable time for compliance; or
(ii) requires disclosure of privileged or other protected matter and no exception or waiver
(B) If a subpoena
(i) requires disclosure of a trade secret or other confidential research, development, or commercial information;
or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of the party, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party on whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified

(d) DUTIES IN RESPONDING TO SUBPOENA.
(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.
(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to content the claim

**Attachment A**
**Subpoena to Epsilon Investment Management L.L.C.**

*Talisman Capital Talon Fund, Ltd. v. Rudolf W. Gunnerman, et al.*

<u>INSTRUCTIONS AND DEFINITIONS</u>

## 1. INSTRUCTIONS

A. In responding to the following requests, you are requested to furnish all information and documents known or available to you, without limitation, regardless of whether these documents are in your possession, custody, or control or in the possession, custody, or control of your agents, representatives, investigators, attorneys, servants, employees, accountants, consultants, or other persons or entities acting or purporting to act on your behalf.

B. If any of these requests cannot be responded to in full, respond to the extent possible, specifying the reasons for your inability to respond the remainder and stating whatever information, knowledge or belief you do or might have concerning the unanswered portion.

C. All uses of the conjunctive herein include the disjunctive, and vice versa. Words in the singular include the plural, and vice versa. All uses of the masculine gender include the feminine gender, and vice versa.

D. If you interpose any objection to any request, state fully the grounds for the objection and the legal authority upon which you will rely in response to a motion to compel.

E. If any requested document exists in electronic form, produce it in that form.

F. If any requested document was formerly, but is no longer, in your possession, custody, or control, or if any document was in existence but is no longer in existence, state the disposition made of the document, including the identify of each person to whom the document was sent; the date of the disposition: the identity of the person(s) who ordered or authorized the disposition: and the identity of the person who made the disposition.

G. If any request calls for an answer which is deemed by you to be privileged, to be an attorney's work product or is otherwise exempt from disclosure, please provide the following information in your response to said request:

1. The reason for assertion of privilege, work product or other grounds for non-disclosure;

2. A statement of the basis for the claim of privilege, work product or other grounds for non-disclosure;

3. A description of any document responsive to the request including in said description the name and job title of any person or persons who have received a copy of and/or reviewed the document, the date of the document, its subject matter and the identity, job title and current address of its current custodian;

4. The name, business address, and present position of the document's author(s);

5. The position of the author(s) at the time the document(s) was/were prepared;

6. The name, business address, and present position of the document's addressee and all other recipients of the document(s);

7. The position of the document's addressee and all other recipients at the time the document(s) was/were prepared and at the time it was received; and

8. The facts and law upon which you will rely in support of that contention in response to a motion to compel.

## 2. DEFINITIONS

1. The term "Document(s)" means the original, and all non-identical copies (whether different from the original because of additional notations or otherwise), of all written, printed, typed, recorded, or graphic matter, however produced or reproduced, in the actual or constructive possession, custody or control of plaintiff, including, without limitation, all writings, drawings, graphs, charts, photographs, photographic records, sound reproduction tapes, data compilations (whether tangible or intangible, from which information can be obtained or can be translated through detection devices into a reasonably usable tangible form), correspondence, memoranda, data, notes, diaries, papers, letters, communications, telegrams, e-mails, messages of any kind, minutes of meetings, stenographic, typewritten, electronic or handwritten notes, studies, estimates, reports, instructions, requests, pamphlets, brochures, applications, returns, pictures, books, journals, ledgers, leaflets, exhibits, maps, survey, sketches, microfilm, Xerox or any other tangible things which constitute or contain matters within the scope of Fed. R. Evid. 1001. The term "Document(s)" also includes but is not limited to any electronically stored data on magnetic or optical storage media as an "active" file or files (readily readable by one or more computer applications or forensics software); any "deleted" but recoverable electronic files on said media; any electronic file fragments (files that have been deleted and partially overwritten with new data); and slack (data fragments stored randomly from random access memory on a hard drive).

2. The term "Application for Patent 6,402,939 (filed Sep.28.2000)" refers to the Application filed with the USPTO on or about September 28, 2000.

3. The terms "U.S. Patent No. 6,402,939", "Patent 6,402,939 (issued June 12, 2002)" or "939 Patent" each refer to the patent granted by the USPTO as a result of the Application for Patent 6,402,939 (filed September 28, 2000).

## DOCUMENTS TO BE PRODUCED

1. Any and all documents and record of communications relating to the following documents:

   (a) the Agreement attached hereto as Exhibit 1, including CFT Board approval of the Agreement;

   (b) the Exclusive License Agreement, and all amendments thereto, attached hereto as Exhibit 2;

   (c) the Consulting Agreement, attached hereto as Exhibit 3;

   (d) the Technology Transfer and Assignment Agreement, and all amendments thereto, attached hereto as Exhibit 4;

   (e) the Termination and Release Agreement, attached hereto and Exhibit 5; and

   (f) the Amendment to Technology Transfer and Assignment Agreement attached hereto as Exhibit 6.

   (g) the Note Purchase Agreement attached hereto as Exhibit 7.

# EXHIBIT 1

# AGREEMENT

This agreement is entered into between Rudolf W. Gunnerman ("Gunnerman") and Clean Fuels Technology, Inc. ("CFT"), as follows:

1. <u>Transactions not Severable</u>. Gunnerman understands that the Board of CFT or, in some cases the independent directors thereof, must approve the provisions of this agreement relating to the separate corporate opportunity and the issuance of securities. Should any of the transactions set forth herein not be approved by the Board or be approved in a substantively different manner, Gunnerman shall have the right, at his option, to cancel this entire agreement and any documents, proxies, appointments or other actions agreed to herein by Gunnerman shall be void *ab initio*.

2. <u>Certain Voting Rights</u>. Gunnerman shall grant a proxy to vote the shares of CFT which he or his wife own personally to Kristina Gunnerman-Ligon. The proxy shall be in the form attached hereto as Exhibit A. Gunnerman shall accept the resignation of Arnold S. Jacobs, the current trustee of the GRAT established by his spouse, and shall appoint Steven D. Ligon as the successor trustee. The substitution of Trustee shall be in the form attached hereto as Exhibit B.

3. <u>Proskauer Rose Relationship.</u> Gunnerman shall terminate his relationship with the law firm of Proskauer Rose and shall waive certain conflicts with that firm in the form attached as Exhibit C.

4. <u>Board of Director Terms</u>. Gunnerman and CFT agree that the terms of office for the current Board of Directors shall be extended to three years for all incumbent directors. Counsel for CFT shall advise the best method to accomplish such extension.

5. <u>Warrants and Share Adjustments to Third Parties</u>. In connection with sale of certain of his shares, Gunnerman has issued warrants to certain of the purchasers for the acquisition of additional shares from him. The issuance of these shares shall be the sole responsibility of Gunnerman and not that of CFT. Certain of the purchasers of shares from Gunnerman have the right to the adjustment of their share purchases to the same price as the most favorable price that shares are sold to independent purchasers. Such adjustment of shares sold shall be the sole responsibility of Gunnerman and not that of CFT; provided, however, that any adjustment as the result of a transaction by CFT after the date hereof shall be the responsibility of CFT and not Gunnerman.

6. <u>Shoham Shares</u>. In connection with the settlement of certain litigation commonly referred to as the *Shoham* case, Gunnerman transferred 100,000 of his individual shares to counsel for the plaintiffs in that action. The issuance of these shares shall be the sole responsibility of Gunnerman and not that of CFT.

7. <u>Issuance of Warrants</u>. CFT agrees to issue to Gunnerman warrants to acquire up to 1,850,000 shares of the common stock of CFT. The warrant shall be issued at a strike price of $4.5045045 per share and shall be on substantially the same terms as the warrants issued by Gunnerman to third parties referred to in paragraph 4. above.

CFT-1415
CFT-1415

8. **Debt Conversion**. CFT has accumulated a debt to Gunnerman for advances made to CFT by Gunnerman from time to time. CFT agrees to convert so much of that debt, in excess of $10,000,000 as is requested by Gunnerman at a per share price of $4.5045045.

9. **Separate Corporate Opportunity**. Gunnerman has formed, capitalized and developed a company originally known as GRD, Inc and now known as SulphCo. A primary asset of SulphCo is a technology for the reduction of sulfur in petroleum products. CFT agrees that SulphCo is and shall remain the sole property of Gunnerman and that SulphCo was not a corporate opportunity of CFT and that the development of SulphCo's technology was separate and apart from CFT.

10. **Future Related Party Transactions**. If transactions arise in the future that may present a conflict between Gunnerman and CFT, any such transaction shall be subject to approval by the outside Board members of CFT.

11. **Independent Representation**. Neither CFT nor any employee or agent of CFT has given any advice to Gunnerman in connection with the preparation or execution of this agreement. Gunnerman has had the opportunity to secure independent legal advice and CFT has suggested that he do so.

12. **Entire Transaction**. This agreement contains the entire agreement of the parties with respect to the matters covered herby. There has been no representation by either party to the other to induce the execution of this agreement that is not memorialized in this agreement. This agreement may only be changed by a written amendment referring to this agreement and executed by both parties.

Dated this 28 day of November 2000.


Rudolf W. Gunnerman


Clean Fuels Technology, Inc.


By _____
     Thomas N. Harvey,
     Chief Executive Officer

CFT-14159

# EXHIBIT 2

EXCLUSIVE LICENSE AGREEMENT

This Agreement is entered into this 3rd day of January, 1994, and replaces that certain Exclusive License Agreement between the parties dated the 2nd day of November, 1992, between Rudolf W. Gunnerman (herein called "Licensor"), and A-55, L.P., a Nevada limited partnership (herein called "Licensee"), based on the following facts:

A.    Incident to the formation of Licensee and in consideration of the issuance of partnership interests therein, Licensor is obligated to grant this Exclusive License.

B.    Licensor is and may in the future become the owner of certain Technology as hereinafter defined, which Licensee wishes to acquire the right to use in the Licensed Territory.

Based on the foregoing the parties agree as follows:

1.    Definitions

As used herein, the following terms shall have the meanings set forth below.

1.1  "Field" means:

(a) methods, processes, compositions and apparatuses for carrying out combustion for the generation of heat in internal combustion engines, either compression or spark-ignited;

(b) aqueous fuels, including fuels described in the Patents, as well as (i) methods, processes, apparatuses and compositions for their production and (ii) methods, processes, compositions and apparatuses for their combustion; and

(c) methods, processes, compositions and apparatuses used for production of chemicals, petrochemicals, plastics or

1.

pharmaceuticals utilized in connection with any of the above;

1.2 "Patent" or "Patents" means all existing and future patents, patent applications, and like grants in the Licensed Territory that (i) concern or relate to the Field (including but not limited to the patents and patent applications listed in Exhibit A hereto) and that (ii) as of the date of this Agreement or during its term as defined below are or become owned or controlled by Licensor or in which Licensor otherwise has or acquires the power to grant rights thereunder, and all continuations, divisionals, continuations-in-part, substitutes, extensions, reissues, confirmations, registrations, revalidations, or additions of any of the foregoing.

1.3 "Service Marks" or "Trademarks" means all existing and future Service Marks, Trademarks, applications for the same, and like grants in the Licensed Territory that (i) concern or relate to the Field (including but not limited to the Service Marks and Trademarks and applications therefor listed in Exhibit A hereto) and that (ii) as of the date of this Agreement or during its term as defined below are or become owned or controlled by Licensor or in which Licensor otherwise has or acquires the power to grant rights thereunder.

1.4 "Technology" means all existing and future inventions, discoveries, information, data, know-how, trade secrets, methods, processes, expertise, confidential information, apparatuses, compositions and works of authorship, whether or not protected by patent, copyrights, service marks or trademarks that (i) are within the Field, and (ii) are owned or controlled by Licensor or as to which Licensor has the power to grant rights

2.

thereunder, including but not limited to Patents.    Unless the context of this Agreement requires otherwise, the term "Technology" shall include the Technology and know-how as defined in this section, the Patents, the Service Marks, and the Trademarks.

1.5  "Licensed Territory" means the United States, Canada and Mexico.

1.6  "Licensed Products" means:

(a)   products,  compositions,  services,  and apparatuses, the manufacture, use, importation or sale of which in the absence of the licenses granted hereunder would infringe at least one claim of a Patent; and

(b) products, compositions and apparatuses which, in whole or in part, employ or are within the definition of Technology.

1.7  "Licensed Processes" means:

(a)  processes and methods, the use of which in the absence of the licenses granted hereunder would infringe at least one claim of a Patent; and

(b)   processes and methods which, in whole or in part, employ or are within the definition of Technology.

## 2.  Patent License

2.1  Licensor hereby grants to Licensee, to the extent of the Licensed Territory and to the exclusion of Licensor, the sole and exclusive license to practice the Patents within the Field, including but not limited to the manufacture, use, importation and sale of Licensed Products and use of Licensed Processes.

3.

### 3. Technology License

3.1  Licensor hereby grants to Licensee, to the extent of Licensed Territory and to the exclusion of Licensor, the sole and exclusive license to practice the Technology and know-how within the Field, including but not limited to the manufacture, use, importation and sale of Licensed Products and use of Licensed Processes.

3.2  Promptly after execution of this Agreement, Licensor shall make available to Licensee for its use all Technology in Licensor's possession needed to make Licensed Products and to use Licensed Processes.

### 4.  Service Mark and Trademark License

4.1  Licensor hereby grants to Licensee, to the extent of the Licensed Territory and to the exclusion of Licensor, the sole and exclusive license to utilize the Service Marks and Trademarks within the Field.

### 5. Retained Ownership

5.1  Subject to the Patent license in Section 2., the Technology license in Section 3., and the Service Mark and Trademark license in Section 4., Rudolf W. Gunnerman retains absolute ownership of all Technology.

### 6. Royalties.

6.1  In consideration of this Agreement, the Licensee shall issue and deliver to Licensor or a limited partnership in

4.

which Licensor is a general partner certain partnership interests in Licensee.

6.2    There shall be no royalty or other monetary consideration payable to Licensor as a result of or for this Agreement.

## 7. Sublicensing

7.1    Licensee shall have the right and obligation to grant sublicenses under this Agreement as more fully set forth in the Limited Partnership Agreement of Licensee, as the same may be amended or extended from time to time and to which this Agreement is attached.

## 8. Representations and Warranties

8.1    Licensor represents and warrants to Licensee:

(a) that Licensor is the exclusive owner of all right, title and interest in and to the Technology, has the right to grant the licenses hereunder, has the right to enter into this Agreement, and has not granted to any other party any similar or conflicting right, license, shop right, or privilege under the Technology or with respect thereto;

(b) that Licensor is not now aware of any prior art, prior offers for sale, or other events, circumstances or other facts that could in his opinion result in a finding that any claim in the Patents are either invalid or unenforceable;

(c) that Licensor is not now aware of any actual, potential or threatened assertions of invalidity by third parties against the Technology, including but not limited to pending or

5.

threatened litigation;

(d) that Licensor is not now aware of any potential, likely or actual charges by third parties of infringement concerning or arising out of the practice or use of the Technology; and

(e) that Licensor is not now aware of any potential, likely or actual charges of infringement made or to be made or that could be made by or on behalf of Licensor against third parties concerning or relating to the Field.

### 9. Term

9.1   The term of the Technology license under Section 3.1 and the Service Mark and Trademark license under Section 4.1 above shall expire only upon the dissolution of Licensee in accordance with terms and conditions of the Limited Partnership Agreement of Licensee, as the same may be amended or extended from time to time and to which this Agreement is attached.

9.2 The term of the Patent license under Section 2.1 above shall expire only (a) upon the expiration of the last of the Patents to expire or (b) upon the dissolution of Licensee in accordance with terms and conditions of the Limited Partnership Agreement of Licensee, as the same may be amended or extended from time to time and to which this Agreement is attached, whichever is earlier.

### 10. Patents

10.1   Rudolf W. Gunnerman shall from and after the date hereof, on behalf of Licensee and at Licensee's sole expense, file,

6.

prosecute, and maintain all Patents.

10.2  The parties acknowledge that the Licensee is being formed to exploit the Technology in the Licensed Territory. Rudolf W. Gunnerman, on behalf of Licensee and at Licensee's sole expense, shall proceed promptly and diligently to obtain patent, copyright, or equivalent protection available under the laws of appropriate jurisdictions with respect to the subject matter of the Technology. All consultants, accountants, attorneys and other professionals utilized by Rudolf W. Gunnerman on behalf of Licensee in discharging his obligations pursuant to Sections 10.1 and 10.2 shall be acceptable to and approved by Licensee.

10.3  Licensee shall have the right and obligation to institute or defend in its name and on behalf of Licensor, prosecute, maintain, and settle or otherwise compromise any actions by or against third parties for infringement. Licensor shall cooperate fully in such actions when so requested by Licensee. Any such defense shall be undertaken on behalf of Licensor and Licensee with counsel acceptable to and approved by Licensor. In the event Licensee determines not to institute or defend, prosecute, maintain, settle or otherwise compromise any actions as contemplated in the first sentence of this section, then Licensor at its option may undertake such actions at its expense, and Licensee shall have no further interest in the Patent which is the subject of such action, the proceeds therefrom, or any subsequent royalty or revenue from such Patent.

## 11. Nonassignability

11.1  Licensee may not assign its rights or obligations

hereunder, except for sublicensing contemplated by Section 7. above.

## 12. Severability

12.1 If any part, term, or provision of this Agreement shall be found illegal or in conflict with any valid controlling law, the validity of the remaining provisions shall not be affected thereby.

## 13. Marketing

13.1 Licensee shall place in a conspicuous location on any products made or sold under any Patent, a patent notice in accordance with 35 U.S.C. §287. Licensee agrees to mark any products made using a process covered by any Patent with the number of each such patent and, with respect to Patents, to respond to any request for disclosure under 35 U.S.C. §287(b)(4)(B) by only notifying Licensor of the request for disclosure.

## 14. Confidentiality

14.1 Each party hereto for itself and on behalf of affiliates agrees not to disclose to any third party any information, materials or documentation relating to the Technology except to the extent such disclosure is required by law, or by the ordinary business operations of Licensor or Licensee (with any sublicenses to contain similar confidentiality obligations), and agrees that such information is proprietary and confidential. At any time that the disclosure of proprietary and confidential

information is required, Licensor or Licensee shall obtain from the party to whom such disclosure is made an appropriate written agreement protecting against the further disclosure or dissemination of such information.

## 15. General Provisions

15.1 Notices.   Any and all notices or other communication required or permitted by this Agreement to be served on or given to any party hereto shall be in writing and shall be deemed duly served and given when personally delivered, given by facsimile, or deposited in the United States mail, by certified mail, return receipt requested, or Express Mail, Federal Express, DHL, or UPS Next Day Air addressed to the parties as follows:

Licensor:
    Rudolf W. Gunnerman
    100 N. Arlington Ave.
    Suite 14-H
    Reno, Nevada  89501
        Fax: (702)826-8393

Licensee:
    A-55 Limited Partnership
    c/o Daniel J. Klaich,
        Sr.Vice Pres.
    210 Gentry Way
    Reno, Nevada  89502
        Fax: (702)826-8383

15.2 Relationship of the Parties.  Nothing in this Agreement shall be construed to create between the parties a partnership, association, joint venture or agency.

15.3 Entire Agreement.  This Agreement cancels and supersedes all prior oral or written representations, agreements and understandings between the parties and embodies all of the understandings and obligations between the parties with respect to the subject matter hereof.  This Agreement may be modified and amended at any time, including the addition of new or deletion of existing know-how and technology pertinent to the license granted

9.

under this Agreement. However, no agreement, modification or extension of this Agreement shall be binding upon any of the parties hereto unless made in writing and signed by both parties.

15.4  Non-Waiver. Failure of either party to require strict performance of any term of this Agreement shall not affect that party's right to enforce the same nor shall any waiver of a default be construed to be a waiver of any other or succeeding default or waiver of this paragraph.

15.5  Legality. If any term or provision, other than royalty provisions of the Agreement, shall be held or adjudged by any court of competent jurisdiction, to be illegal, invalid or an unenforceable term, the remaining provisions shall be deemed to be separable and shall continue in full force and effect.

15.6  Attorneys' Fees. Should any litigation be commenced between the parties hereto concerning this Agreement, or the rights and duties of either party in relation thereto, the party prevailing in such litigation shall be entitled, in addition to such other relief as may be granted, to a reasonable sum as and for attorneys' fees in such action.

15.7  Choice of Law. This Agreement is to be governed by and construed in accordance with the laws of the State of Nevada as they exist from time to time.

15.8  Binding Effect. Subject to the foregoing provisions, this Agreement shall inure to the benefit of, and be binding upon; the parties hereto, their successors, trustees, assigns, heirs, administrators and legal representatives, but shall not inure to the benefit of any other person, firm or corporation.

15.9  Additional Instruments. The parties agree to make,

execute and deliver such additional instruments as are necessary to carry forth the intent of this Agreement.

15.10   Authority.   Each of the parties covenants that this Agreement is executed under authority duly granted.

15.11   Duplicate Originals.   This Agreement has been signed in two (2) duplicate originals.

15.12   Time of the Essence.   Time is expressly declared to be of the essence in this Agreement and each and every provision hereof in which time is an element.

LICENSEE:                                LICENSOR:

    A-55, L.P., a Nevada                  _____
    Limited Partnership                   Rudolf W. Gunnerman,
                                         an individual
    By RWG, Inc., a
      Nevada Corporation,
      General Partner

    By_____
      Daniel J. Maish,
      Senior Vice President

11.

FIRST AMENDMENT TO EXCLUSIVE LICENSE AGREEMENT

This First Amendment is entered into this _2_ day of March, 1995, based on the following facts:

A.    Incident to its formation, A-55, L.P. was granted a license under that certain Exclusive License dated November 2, 1992, and restated January 3, 1994.

B.  Licensor and Licensee have agreed to clarify the Licensed Territory.

Based on the foregoing, the parties agree as follows:

1. - Section 1.5 of the Exclusive License Agreement is amended in its entirety to read as follows:

"1.5  "Licensed Territory" means the world."

2.  The effective date of this First Amendment is January 1, 1995.

LICENSEE:                        LICENSOR:

    A-55, L.P., a Nevada
    Limited Partnership

    By RWG, Inc., a               Rudolf W. Gunnerman,
    Nevada Corporation,           an individual
    General Partner

    By
      Daniel J. Klaich,
      Senior Vice President

## SECOND AMENDMENT TO EXCLUSIVE LICENSE AGREEMENT

This Second Amendment is entered into this 15th day of August, 1998, based on the following facts:

A.   Incident to its formation, A-55, L.P. was granted a license under that certain Exclusive License dated November 2, 1992; restated January 3, 1994; and amended by that certain First Amendment effective January 1, 1995.

B.   Licensor and Licensee desire to further amend the Exclusive License Agreement.

Based on the foregoing, the parties agree as follows:

1.   Section 1.1(a) of the Exclusive License Agreement is amended in its entirety to read as follows:

"1.1   'Field' means:

(a)   methods, processes, compositions and apparatuses for carrying out combustion for the generation of heat in (i) internal combustion engines, either compression or spark ignited and (ii) open flame applications such as boilers and combustion turbines; "

2.   The effective date of this Second Amendment is July 31, 1998.

LICENSEE:

A-55, L.P., a Nevada
Limited Partnership

By RWG, Inc., a
Nevada Corporation,
General Partner

By _____
Daniel J. Klaich,
Executive Vice President

LICENSOR:

_____
Rudolf W. Gunnerman,
an individual

# ASSIGNMENT OF EXCLUSIVE LICENSE

This Assignment of Exclusive License is entered into among the parties hereinafter identified and as of the effective date stated below, based upon the following facts:

A.  Incident to the formation of A-55 L. P. (the 'Limited Partnership), Rudolf W. Gunnerman ("Gunnerman") granted to the Limited Partnership an exclusive license by agreement dated January 3, 1994 (the "Exclusive License"). The Exclusive License is attached hereto as Exhibit A.

B.  Gunnerman and the Limited Partnership have entered into two amendments to the Exclusive License, which amendments are attached hereto as Exhibits B and C, respectively. Unless the context otherwise requires, the term Exclusive License as used herein shall refer to the license as amended by the first and second amendments.

C.  Unless otherwise indicated in this Assignment, all capitalized terms shall have the meanings given to them in the Exclusive License.

D.  The Exclusive License covers certain Technology limited strictly to the Field of the Agreement.

E.  Pursuant to a plan of reorganization, the Limited Partnership was merged into A-55, Inc., a Delaware corporation (the "Corporation"). The Corporation was the surviving entity in the merger. The Corporation succeeded to all of the assets of the Limited Partnership and assumed all of its debts in the merger.

F.  The effective date of the merger was January 28, 1999.

Based upon the foregoing, Gunnerman, the Limited Partnership, and the Corporation agree as follows:

1.  **Assignment of License.** In order to effectuate the terms of the merger, the Limited Partnership hereby assigns and transfers to the Corporation all of its right, title and interest in and to the Exclusive License.

2.  **Acceptance of Assignment.** The Corporation hereby accepts assignment of the Exclusive License and agrees to be bound as Licensee by all of the terms and condition thereof.

3. **Consent to Assignment.** Gunnerman hereby consents to the assignment of the Exclusive License and to the substitution of the Corporation as the Licensee thereunder.

4. **Ratification of Exclusive License.** Gunnerman, as Licensor, and the Corporation, as Licensee, hereby ratify and approve all of the terms and conditions of the Exclusive License. Gunnerman and Licensee specifically affirm that it is their intention by this assignment to transfer solely rights created pursuant to the Exclusive License and not to create any rights in any technology outside the Field of the Exclusive License.

5. **Status of License.** Gunnerman acknowledges that the Exclusive License is in good standing as of the date of this Assignment, and that, to his knowledge, no event of default has occurred which would give rise to any remedy, which might be exercised, on his part.

6. **Term.** Additional paragraphs 9.3 and 9.4 are added to the Exclusive License, reading as follows:

> "9.3 Licensor may at his sole option terminate this Exclusive License Agreement in the event any of the following conditions occur: (a) if a petition in bankruptcy shall be filed by or against Licensee and is not dismissed within seven (7) business days thereafter; (b) if Licensee's business or any substantial portion of Licensee's assets are attached by order of court, and such attachment is not dissolved within seven (7) business days; (c) if Licensee enters into any agreement or composition of creditors; or (d) if all or substantially all of Licensee's assets are transferred to a successor without prior written consent of Licensor."

> "9.4 Upon termination of the Exclusive License Agreement under paragraph 9.3, all rights and licenses granted to Licensee hereunder shall cease and terminate forthwith and Licensee agrees that it shall not use or allow its sublicensees to use any of the Technology."

7. **Waiver of Notice.** The parties hereto waive any notice to which they might be entitled of this Assignment pursuant to the terms of the Exclusive License. In addition, all future notices under the Exclusive License shall be addressed to the parties as follows:

**Licensor:**  Rudolf W. Gunnerman
6601 Windy Hill Way
Reno, NV 89511
Fax: (775) 826-8383

**Licensee:**  A-55, Inc.
5270 Neil Road
Reno, NV 89502
Fax: (775) 826-8383

8. **Effective Date.**  The effective date of this assignment and consent shall be the 27th day of January 1999.

A-55, L.P., a Nevada
    Limited Partnership
By RWG, Inc, a Nevada corporation,
  Its sole General Partner

By _____
Daniel J. Klaich,
Vice President and Secretary

     ASSIGNOR

_____
Rudolf W. Gunnerman
    LICENSOR

A-55, Inc., A Delaware
    corporation

By _____
Daniel L. Klaich,
Executive Vice President

    ASSIGNEE\LICENSEE

# FOURTH AMENDMENT TO EXCLUSIVE LICENSE AGREEMENT

This Fourth Amendment to that certain Exclusive License dated November 2, 1992 (the "Exclusive License") is entered into this 11th day of July, 2001, based on the following facts:

A:    Incident to its formation, A-55, L.P. was granted a license under the Exclusive License which was subsequently restated January 3, 1994; and amended by (i) that certain First Amendment effective January 1, 1995 (the "First Amendment"); (ii) that certain Second Amendment effective July 31, 1998 (the "Second Amendment"); and (iii) that certain Assignment of Exclusive License effective January 27, 1999 (the "Assignment").

B:    Licensor and Licensee desire to further amend the Exclusive License.

Based on the foregoing, the parties agree as follows:

1.  Sections 9.3 and 9.4 of the Exclusive License as it was amended by the Assignment are revoked in their entirety and Section 9.3 is restated in its entirety to read as follows:

> "This Exclusive License shall not terminate in the event of any of the following events: (a) if a petition in bankruptcy shall be filed by or against Licensee and not dismissed within thirty (30) days thereafter; (b) if Licensee's business or a substantial portion thereof are attached by an order of court, and such attachment is not dissolved within fifteen (15) days thereof; or (c) if Licensee enters into any agreement or composition of creditors; provided, however that in any of such instances, Licensee hereby grants back to the Licensor a non-exclusive, worldwide and royalty free license to use or otherwise exploit all Technology within the Field; and provided further that upon the grant of any such

License, Licensor does hereby grant back to Licensee a similar non-exclusive, worldwide and royalty free license to use or otherwise exploit all improvements to the Technology within the Field that he should make subsequent to the effective date of his license pursuant to this paragraph."

2.   The effective date of this Fourth Amendment is April 30, 2001.

3.   Except as amended hereby, the Exclusive License, as amended, is hereby ratified and approved.

LICENSEE:                                LICENSOR:

Clean Fuels Technology, Inc.

A Delaware Corporation                   Rudolf W. Gunnerman,
                                         an individual

By

Daniel J. Klaich,
Executive Vice President

EXHIBIT 3

# CONSULTING AGREEMENT

This **CONSULTING AGREEMENT** (the "Agreement") is dated effective as of December 4, 2000, (the "Effective Date"), between Clean Fuels Technology, Inc., (formerly known as A-55, Inc.) a Delaware Company (the "Company"), and Rudolf W. Gunnerman ("Dr. Gunnerman").

## W I T N E S S E T H

**WHEREAS**, the Company desires to retain the services of Dr. Gunnerman subject to the terms and conditions hereof, and Dr. Gunnerman desires to be retained by the Company; and

**WHEREAS**, the parties hereto desire to set forth in writing the terms and conditions of their understandings and agreements.

**NOW THEREFORE**, in consideration of the foregoing, of the mutual promises contained herein and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.     **POSITION/DUTIES.**

(a)     The Company hereby agrees to retain Dr. Gunnerman to advise it with respect to technology development, strategic planning, corporate governance and business relationships with potential partners and co-venturers. Dr. Gunnerman shall undertake these activities at the request of and under the direction of the CEO and\or President.  In addition to these specific duties, Dr. Gunnerman shall do and perform such other services as are agreed to by and between the Company and Dr. Gunnerman from time to time.

(b)     During the Term of this Agreement, Dr. Gunnerman shall devote sufficient time and hours of his services per week on an as needed and required basis.

2.     **TERM OF AGREEMENT.**  Dr. Gunnerman's term of retention under this Agreement shall be for a term commencing on the Effective Date and ending on the third anniversary of this Agreement unless extended in writing by the parties. .

3.     **BASE PAYMENT.**  The Company agrees to pay Dr. Gunnerman a base amount of $400,000 per year, payable in monthly installments.

07/09/99  10:42 PM  (10605)

PB000768

4.    **OTHER BENEFITS.** It is explicitly understood and agreed that no employer/employee relationship is created between the parties to this agreement and that Dr. Gunnerman shall have no right to participate in any benefit, bonus or other plan administered for the benefit of the employees of the Company. Dr. Gunnerman will have access to an office and reasonable administrative support in the conduct of his duties. Dr. Gunnerman understands that the office and assistance are being provided to support the performance of his duties defined herein and does not constitute a full time workplace.

5.    **BUSINESS EXPENSES.** During the Term of this Agreement, upon presentation of appropriate documentation, Dr. Gunnerman shall be reimbursed in accordance with the Company's expense reimbursement policies for all reasonable and necessary business expenses incurred in connection with the performance of his duties hereunder. Dr. Gunnerman understands and agrees that all travel on behalf of the Company must be approved in advance, as must any expenditure greater than US$250.00.

6.    **TERMINATION.** This agreement shall terminate upon the earliest to occur of the following: the expiration of the term hereof, the death of Dr. Gunnerman, or the disability of Dr. Gunnerman. If Dr. Gunnerman determines that he no longer wishes to perform consulting services for the Company, this Agreement may be terminated. [Since we are doing a contract with Rudy and an assignment, I left this paragraph alone.]

7.    **CONSEQUENCES OF TERMINATION.** Upon such termination, the Company shall pay Dr. Gunnerman any unpaid balance through the date of termination.

8.    **INVENTIONS AND IMPROVEMENTS.** During the Term of this Agreement, Dr. Gunnerman shall promptly communicate to the Company all ideas, discoveries and inventions that are or may be useful to the Company or its business within the "Field" (as that term is defined in that certain Exclusive License Agreement dated January 3, 1994, as amended, between Dr. Gunnerman and the predecessor in interest of the Company (the "Exclusive License"). . Dr. Gunnerman acknowledges that all ideas, discoveries, inventions and improvements which are made, conceived or reduced to practice by Dr. Gunnerman and every item of knowledge within the Field and relating to the Company's business interests (including potential business interests) gained by Dr. Gunnerman during the Term of this Agreement are the property of the Company, and Dr. Gunnerman hereby irrevocably assigns all such ideas, discoveries, inventions, improvements and

PB000769

knowledge that are within the Field to the Company for its sole use and benefit, without additional compensation. Dr. Gunnerman shall, upon request of the Company, but at no expense to Dr. Gunnerman, at any time during or after his retention by the Company, sign all instruments and documents requested by the Company and otherwise cooperate with the Company to protect its right to such ideas, discoveries, inventions, improvements and knowledge, including applying for, obtaining and enforcing patents and copyrights thereon in any and all countries. The obligations of Dr. Gunnerman imposed by this agreement are supplementary to and do not in any way supersede ,limit, modify or expand his rights or obligations under the Exclusive License.

9.     NO ASSIGNMENTS. This Agreement may be assigned by Dr. Gunnerman to an entity controlled by him; provided, however, that such assignment shall not relieve Dr. Gunnerman of any responsibilities or obligations hereunder. This Agreement shall be assignable by the Company only by merger or upon the sale of a majority of the assets of the Company. This Agreement shall inure to the benefit and be binding upon the personal or legal representatives, executors, administrators, successors, heirs, distributees, devisees, legatees and permitted assignees of the parties hereto.

10.     NOTICE. For the purpose of this Agreement, notices and all other communications provided for in this Agreement shall be in writing and shall be deemed to have been duly given when delivered or mailed by United States certified or registered mail, return receipt requested, postage prepaid, addressed to Dr. Gunnerman, at the address specified below Dr. Gunnerman's name at the end of this Agreement and to the Company at Clean Fuels Technology, Inc. 5270 Neil Road, Reno, Nevada 89502, Attention: Chief Executive Officer, or to such other address as either party may have furnished to the other in writing in accordance herewith.

11.    RESTRICTIVE COVENANTS.

(a)    CONFIDENTIALITY. Dr. Gunnerman acknowledges that in his retention hereunder, he will occupy a position of trust and confidence. Dr. Gunnerman shall not, except as may be required to perform his duties hereunder, to defend his own rights or as required by applicable law, without limitation in time or until such information shall have become public or known in the Company's industry other than by Dr. Gunnerman's unauthorized disclosure, disclose to others or use, whether directly or indirectly, any Confidential Information regarding the Company. "Confidential Information" shall mean information about the Company,

PB000770

its subsidiaries and affiliates, and their respective clients and customers that is not disclosed by the Company for financial reporting purposes and that was learned by Dr. Gunnerman in the course of his employment by the Company, including (without limitation) any proprietary knowledge, trade secrets, data, formulae, information and client and customer lists and all papers, resumes, and records (including computer records) of the documents containing such Confidential Information. Dr. Gunnerman acknowledges that such Confidential Information is specialized, unique in nature and of great value to the Company, and that such information gives the Company a competitive advantage. Dr. Gunnerman agrees to deliver or return to the Company, at the Company's request at any time or upon termination or expiration of this Agreement or as soon thereafter as possible, all documents, computer tapes and disks, records, lists, data, drawings, prints, notes and written information (and all copies thereof) furnished by the Company or prepared by Dr. Gunnerman during the term of Dr. Gunnerman's employment by the Company.

(b)   **NON-COMPETITION.** During Dr. Gunnerman's retention by the Company, Dr. Gunnerman shall not, directly or indirectly, without the prior written consent of the Company, enter into Competition with the Company or its affiliates. "Competition" shall mean participating, directly or indirectly, as an individual proprietor, partners, stockholder, officer, employee, director, joint venturer, investor, lender, Dr. Gunnerman or in any capacity whatsoever in a business within the Field in competition with any business conducted by the Company or its affiliates, with regard to which Dr. Gunnerman had responsibilities or had access to confidential information, while employed by its Company or its affiliates. It is further expressly agreed that the Company will or would suffer irreparable injury if Dr. Gunnerman were to compete with the Company or any subsidiary or affiliate of the Company in violation of this Agreement and that the Company would by reason of such competition be entitled to injunctive relief in a court of appropriate jurisdiction, and Dr. Gunnerman further consents and stipulates to the entry of such injunction relief in such a court prohibiting Dr. Gunnerman from competing with the Company or any subsidiary or affiliates of the Company in violation of this Agreement.

(c)   **NON-SOLICITATION OF CUSTOMERS AND SUPPLIERS.** During the term of this Agreement and for a period of three (3) years after termination, Dr. Gunnerman shall not, directly or indirectly, influence or attempt to influence customers or suppliers of the Company or any of its

PB000771

subsidiaries or affiliates, to divert their business to any Competitor of the Company within the Field.

(d)     NON-SOLICITATION OF EMPLOYEES. Dr. Gunnerman recognizes that he may possess confidential information about other employees of the Company relating to their education, experience, skills, abilities, compensation and benefits, and inter-personal relationships with customers of the Company. Dr. Gunnerman recognizes that the information he may possess about these other individuals is not generally known, is of substantial value to the Company in developing its business and in securing and retaining customers, and has been and will be acquired by him because of his business position with the Company. Dr. Gunnerman agrees that during the term of this Agreement and for a period of three (3) years after termination, he will not, directly or indirectly, solicit or recruit any non-administrative or non-clerical employee of the Company for the purpose of being employed by him or by any competitor of the Company on whose behalf he is acting as an agent, representative or employee and that he will not convey any such confidential information or trade secrets about other employees of the Company to any other person.

(e)     SURVIVAL OF PROVISIONS. The obligations contained in this Section 11 shall survive the termination or expiration of Dr. Gunnerman's retention by the Company and shall be fully enforceable thereafter. If it is determined by a court of competent jurisdiction in any state that any restriction in this Section 11 is excessive in duration or scope or extends for too long a period of time or over too great a range of activities or in too broad a geographic area or is unreasonable or unenforceable under the laws of that state, it is the intention of the parties that such restriction may be modified or amended by the court to render it enforceable to the maximum extent permitted by the law of that state.

12.     AGREEMENT BINDING ON ASSISTANTS AND AGENTS. Dr. Gunnerman shall have the right to perform the consulting services required hereunder personally or with the assistance of such personnel as he may deem necessary and appropriate; provided, however, that the provisions of this Agreement, including but not limited to the provisions of paragraphs 8 and 11 shall apply to all such assistants, agents, employees or consultants of and to Dr. Gunnerman, and provided further, that if Dr. Gunnerman elects to perform any such consulting services through or with the assistance of such agents, the cost thereof shall be Dr. Gunnerman's. Before

PB000771

divulging any confidential information of the Company to any such person Dr. Gunnerman shall secure the signature of such person to the provisions hereof, including but not limited to paragraphs 8 and 11.

13.    **LIABILITY FOR TAXES.** The relationship between the parties hereto shall be that of Independent Contractor to Retaining Party. No employer/employee relationship is intended or shall be construed from this Agreement. The Company shall have no obligation to withhold any amount from the payments required hereunder for the payment of any taxes due from Dr. Gunnerman.

14.    **SEVERABILITY.** The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.

15.    **ARBITRATION.** Any dispute or controversy arising under or in connection with this Agreement shall be settled exclusively by arbitration, conducted before a panel of three (3) arbitrators in the State of Nevada in accordance with the National Rules for the Resolution of Employment Disputes of the American Arbitration Association then in effect. Judgment may be entered on the arbitrator's award in any court having jurisdiction; provided, however, that (i) Dr. Gunnerman shall be entitled to seek specific performance of his right to be paid until the date of termination during the pendency of any dispute or controversy arising under or in connection with this Agreement; and (ii) the Company shall be entitled to seek specific performance as specified in Section 11 of this Agreement. The parties agree that they are entitled in any arbitration proceeding to the entry of an order, by a court of competent jurisdiction pursuant to an opinion of the arbitrator, for specific performance of any of the requirements of this Agreement.

16.    **MISCELLANEOUS.** No provision of this Agreement may be modified, waived or discharged unless such waiver, modification or discharge is agreed to in writing and signed by Dr. Gunnerman and an authorized officer of the Company. No waiver by either party hereto at any time of any breach by the other party hereto of, or compliance with, any condition or provision of this Agreement to be performed by such other party shall be deemed a waiver or similar or dissimilar provisions or conditions at the same or at any prior or subsequent time. No agreements or representations, oral or otherwise, express or implied, with respect to the subject matter hereof have been made by either

PB000771

party which are not expressly set forth in this Agreement.  The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Nevada without regard to its conflicts of law principles.  The parties hereto accept the exclusive jurisdiction of those courts for the purpose of any such suit, action or proceeding.  Venue for any such action, in addition to any other venue permitted by statute, will be Reno, Nevada.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first printed above.

Dr. Rudolf W. Gunnerman

> 6601 Windy Hill Way
> Reno, NV 89511
>        With a copy to
> 5250 Neil Road
> Suite 300
> Reno, NV 89502

Clean Fuels Technology, Inc.

By _____
Thomas N. Harvey,
Chief Executive Officer

PB000774

# EXHIBIT 4

# TECHNOLOGY TRANSFER AND ASSIGNMENT AGREEMENT

THIS TECHNOLOGY TRANSFER AND ASSIGNMENT AGREEMENT, dated April 23, 2003 (this "Agreement"), is by and between Dr. Rudolf W. Gunnerman, an individual resident of the County of Washoe, State of Nevada ("Assignor") and Capital Strategies Fund, Ltd. ("Assignee").

## RECITALS

A.    Assignor holds certain Intellectual Property Rights, more fully defined or referenced below, related to combustion and aqueous fuel technologies, and has entered into an Exclusive License Agreement, dated January 3, 1994 (and as amended effective January 1, 1995, July 31, 1998, January 27, 1999 and April 30, 2001) (as so amended, the "Exclusive License") with Clean Fuels Technology, Inc. (and certain of its predecessors in interest) (the "Licensee"), related to such rights.

B.    On the effective date of this Agreement, Assignor is entering into that certain Note Purchase Agreement, of even date herewith, with Assignee and an affiliate of Assignee (the "Note Purchase Agreement") and certain other agreements referenced therein.

C.    In connection with the foregoing transactions, this Agreement sets forth the terms and conditions upon which Assignor assigns and transfers to Assignee all of his present and future right, title and interest in and to the Intellectual Property Rights defined or referenced below, including an assignment of the Exclusive License.

## AGREEMENT

In consideration of the representations, warranties, covenants and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows

## SECTION 1

1.    **DEFINITIONS**

1.1.    Terms Incorporated.  Capitalized terms used but not defined herein will have the meaning provided in the Exclusive License. Any references to or uses of the term "including" in this Agreement shall mean "including without limitation" or "including, but not limited to," and no references to or uses of such latter phrases in this Agreement shall mean or be read to imply any different meaning for "including." For purposes of this Agreement, "Knowledge" means knowledge actually possessed by a specified person and such knowledge as would have or should have come to the attention of such persons in the course of due inquiry and preparation and negotiation of this Agreement and the related Exhibits and other documents, certificates or other writings furnished pursuant hereto.

1

SECTION 2

2.  TRANSFER AND ASSIGNMENT OF INTELLECTUAL PROPERTY RIGHTS AND PAYMENT OF PURCHASE PRICE

2.1.  <u>Transfer and Assignment of Intellecual Property Rights</u>. Subject to the terms and conditions of this Agreement, Assignor hereby assigns, transfers, conveys and delivers to Assignee and Assignee hereby acquires from Assignor, free and clear of any mortgage, lien, pledge, option, security interest, claim, charge or other encumbrance of any kind whatsoever, whether or not of record (collectively, "<u>Encumbrances</u>") (other than the Exclusive License) all of Assignor's present and future right, title and interest in and to the following, in each case to the extent related to or in connection with, the Field (collectively, the "<u>Assigned Assets</u>"):

(i)  all patent applications and patent rights, as well as all reissues, divisionals, continuations and continuations-in-part thereof, any corresponding foreign patent rights and any other patents issuing thereon, including, without limitation, the patents and patent applications listed on <u>Exhibit 2.1(i)</u> (collectively, all of the foregoing being the "<u>Patent Rights</u>");

(ii)  any common law and registered trademarks and unregistered trademarks, logos, service marks, trade dress and trade names, and all applications, registration certificates, Section 8 affidavits, renewals, investigations, search reports, histories and other documents or files subject to the Exclusive License (the "<u>Trademarks</u>");

(iii)  all copyright registrations and applications used or held for use by Assignor and any other non-registered copyrights or copyrightable works (collectively, the "<u>Copyrights</u>");

(iv)  all technical information and know-how, confidential and non-confidential, including all computer software, patterns, plans, designs, research data, trade secrets, formulae, drawings, instructions, manuals, data, records and other documents relating to the foregoing (collectively, the "<u>Know-How</u>," and, together with the Patent Rights, the Trademarks and the Copyrights, the "<u>Intellectual Property Rights</u>");

(v)  all license agreements, including the Exclusive License, assignments of inventions and other agreements which relate to the Intellectual Property Rights;

(vi)  all restrictions on competition and obligations regarding confidentiality pertaining to the Intellectual Property Rights imposed on third parties by Assignor; and

(vii)  all rights to enforce, claims, credits, causes of action, and rights to damages, profits or set-off whatsoever, whether known or unknown, relating to the Intellectual Property Rights.

2.2.    All Other Assets and Liabilities Excluded.    Other than pursuant to the Note Purchase Agreement, Assignee is not acquiring any other assets or rights of Assignor, and is not assuming and hereby expressly disclaims any assumption of any liabilities, obligations, debts or payables of any nature of Assignor, whether fixed or contingent, known or unknown, liquidated or unliquidated, secured or unsecured, accrued or unaccrued, or otherwise.

2.3.    Purchase Price.  Subject to the terms and conditions of this Agreement, in reliance on the representations, warranties and agreements of Assignor contained herein, and in consideration of the transfer and assignment of the Assigned Assets, Assignee has paid Assignor the sum of Fifty Thousand Dollars ($50,000.00) by check or wire transfer of immediately available funds upon execution of this Agreement (the "Purchase Price"), the receipt and sufficiency of which is hereby acknowledged.

2.4.    Deliveries by Assignor.  Upon execution and delivery of this Agreement, Assignor will deliver to Assignee, at Assignee's cost, such instruments of conveyance, transfer and assignment as shall be prepared by Assignee to transfer to and vest in Assignee good, valid, and marketable title to the Assigned Assets (the "Assignment Documents").

2.5.    Further Assurances.  From and after the date hereof, Assignor shall from time to time, at the request of Assignee and at Assignee's cost, execute and deliver such other instruments of conveyance, assignment and transfer as Assignee may reasonably request in order to more effectively consummate the transactions contemplated herein and to vest in Assignee good and marketable title to the Assigned Assets. Assignee shall be responsible for preparing such instruments of conveyance, and for recording the same, including paying any and all costs incurred in connection with such activities.  Assignor shall cooperate in any reasonable arrangement to the end that Assignee shall be provided the full use and benefits of such Assigned Assets as contemplated by this Agreement. Notwithstanding anything in this Agreement to the contrary, neither this Agreement nor any document or instrument delivered pursuant hereto shall constitute an assignment of any Assigned Asset, or any claim or right or any benefit arising thereunder or resulting therefrom, if an attempted assignment thereof without the consent or approval of any other party thereto or issuer thereof would constitute a breach thereof or in any way adversely affect the rights to be assigned.

## SECTION 3

3.    REPRESENTATIONS AND WARRANTIES

Assignor hereby represents and warrants to Assignee as follows:

3.1.    Authorization.  Assignor has authority to enter into this Agreement and the Assignment Documents and to carry out the transactions contemplated herein and therein. This Agreement and each Assignment Document have been duly and validly executed by Assignor and are valid and binding legal obligations of Assignor, enforceable against him in accordance with their terms.

3.2.    Consents and Approvals.  No consent, approval, order or authorization of or from, or registration, notification, declaration or filing with any individual or entity, including any governmental authority, is required in connection with the execution, delivery or performance of

this Agreement or the Assignment Documents by Assignor, or the consummation by Assignor of the transactions contemplated herein or thereby.

3.3.    <u>Intellectual Property Rights</u>.

(a)    Assignor owns, and has the unrestricted right to assign and transfer, the Intellectual Property Rights pursuant to the terms of this Agreement, free and clear of all Encumbrances (other than the Exclusive License).  Assignor does not hold any of the Intellectual Property Rights pursuant to any license, sublicense or other agreement nor has Assignor granted any person or entity any rights, license, sublicense or other agreement or otherwise, to use the Intellectual Property Rights, other than pursuant to the Exclusive License.

(b)    At Assignee's request and expense, Assignor will furnish to Assignor copies of all documentation relating to the Know-How in his possession.

3.4.    <u>Litigation</u>.    To the Assignor's Knowledge, there is no legal, administrative, arbitration, or other proceeding, suit, claim or action of any nature or investigation, review or audit of any kind (including a proceeding, suit, claim or action, or an investigation, review or audit, involving any environmental Law or matter), judgment, decree, decision, injunction, writ or order pending, noticed, scheduled or, threatened by or against or involving Assignor or their respective assets, properties, directors, officers, agents or employees (but only in their capacity as such), whether at law or in equity, before or by any person or entity or governmental authority related in any way to the Assigned Assets.

SECTION 4

4.    COVENANTS

4.1.    <u>Confidentiality</u>.

(a)    <u>Covenant</u>.  From and after the date of this Agreement, except as otherwise consented to by Assignee in writing, (i) Assignor will not directly or indirectly disclose this Agreement or the existence of this Agreement except as required by the terms of a valid and effective subpoena or order issued by a court of competent jurisdiction or by a governmental body, and (ii) if Assignor or any of his agents or representatives receives a request to disclose this Agreement or the existence of this Agreement, Assignor will (A) within four business days, immediately notify Assignee of the existence, terms and circumstances surrounding such request, (B) consult with Assignee on the advisability of taking legally available steps to resist or narrow such request, and (C) if disclosure of such information is required, and at Assignee's cost and expense, exercise reasonable commercial efforts to obtain an order or other reliable assurance that confidential treatment will be accorded such portion of the disclosed information which Assignee so designates.

(b)    <u>Remedy</u>.  The covenants and undertakings contained in this Section 4.1 relate to matters which may be of a special, unique and extraordinary character and a violation of any of the terms of this Section 4.1 may cause irreparable injury to Assignee,

the amount of which may be impossible to estimate or determine and for which adequate compensation may not be available. Therefore, Assignee shall be entitled to an injunction, restraining order or other equitable relief from a court of competent jurisdiction, restraining any violation or threatened violation of any such terms by Assignor and such other persons as the court orders.

4.2.   Disclosure.   Except as may otherwise be agreed in writing by Assignee or required by any law or governmental authority, Assignor shall not, at any time, disclose this Agreement or any of the terms hereof (including the Purchase Price) or of the transactions contemplated herein, except to advisors who have a need to know.

4.3.   Power of Attorney.   Assignor appoints Assignee and its successors and assigns as the true and lawful attorney or attorneys of Assignor, with full power of substitution, in the name of Assignor, but on behalf and for the benefit of and at the expense of Assignee: (a) to institute and prosecute, in the name of Assignor or otherwise, all proceedings which Assignee may deem necessary or desirable in order to collect, assert or enforce any claim, right or title of any kind in or to the Assigned Assets; (b) to defend and compromise any and all actions, suits or proceedings in respect of the Assigned Assets to the extent liability therefore has been assumed by Assignee hereunder; and (c) to do all such acts and things in relation to the foregoing as is reasonably necessary to exercise such powers, as Assignee may deem advisable.  The foregoing power is coupled with an interest and shall be irrevocable by Assignor for any reason.  Assignee shall retain for its own account any amounts collected pursuant to the foregoing power, including any sums payable as interest in respect thereof, and Assignor shall pay to Assignee, when received, any amounts which shall be received by Assignor in respect of any receivables or other assets or properties related to the Assigned Assets.

4.4.   Non-Competition and Non-Solicitation.   Assignor agrees that any agreement between Assignor and Licensee relating to non-competition and non-solicitation shall from the date hereof be deemed made for the benefit of Assignee, and Assignee shall have the right to enforce such agreements, and to seek damages from Assignor upon breach, as if Assignee were a signatory thereto.

4.5.   Assistance in Prosecution and Infringement Actions.

(a)   In connection with future prosecution or maintenance of any of the Intellectual Property Rights, Assignor will fully cooperate with Assignee, with all costs thereof to be borne by Assignee.

(b)   In the event of any third party action claiming infringement of or by any of the Intellectual Property Rights brought by or against Assignee and/or Licensee, Assignor will fully cooperate with Assignee and / or Licensee, as the case may be, at the cost of Assignee and/or Licensee, as appropriate, in connection with the prosecution or defense thereof, as the case may be (including providing testimony, to the extent required).

SECTION 5

5.    SURVIVAL AND INDEMNIFICATION

5.1.    <u>Survival of Representations, Warranties and Covenants</u>.  All representations and warranties of Assignor contained herein shall survive the execution and delivery of this Agreement and the transactions contemplated hereby for a period ending on the third (3rd) anniversary of the date hereof. ·The covenants and agreements of Assignor contained herein shall survive without limitation as to time.  The respective expiration dates for the survival of the representations and warranties and the covenants shall be referred to herein as the relevant "<u>Expiration Date</u>."  In the event a claim is made against a representation, warranty or covenant prior to its respective Expiration Date, the Expiration Date shall be tolled as to such claim until the claim is finally resolved.

5.2.    <u>Indemnification by Assignor</u>.  Assignor agrees to indemnify and hold Assignee its officers, directors, employees and agents harmless from and against all loss, liability, damage, and actions and against all claims in respect thereof (including amounts paid in settlement, reasonable costs of investigation and diminution of value herein referred to collectively as "<u>Losses</u>" or individually as a "<u>Loss</u>") to which Assignee may become subject to or which it may suffer or incur, directly or indirectly, as a result of (a) any untrue representations or breach of warranty by Assignor in any part of this Agreement or any part of the Assignment Documents, notice of which is given to Assignor on or prior to the relevant Expiration Date, (b) the breach of or non-fulfillment of any covenant, agreement or undertaking of Assignor in any part of this Agreement or any part of the Assignment Documents, (c) any retained liability of Assignor, and (d) any and all costs and expenses including reasonable legal fees and expenses, incurred in connection with enforcing the indemnification rights of Assignee pursuant to this Section 5.2.

SECTION 6

6.    MISCELLANEOUS PROVISIONS

6.1.    <u>Amendment and Modification</u>.  Subject to applicable Law, this Agreement may be amended or modified by written agreement of the parties hereto.

6.2.    <u>Waiver of Compliance: Consents</u>.  Any failure of a party to comply with· any obligation, covenant, agreement or condition herein may be expressly waived in writing by the party entitled hereby to such compliance, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.  No single or partial exercise of a right or remedy shall preclude any other or further exercise thereof or of any other right or remedy hereunder.  Whenever this Agreement requires or permits the consent by or on behalf of a party, such consent shall be given in writing in the same manner as for waivers of compliance.

6.3.    <u>No Third Party Beneficiaries</u>.  Nothing in this Agreement shall entitle any person or entity (other than a party hereto and his, her or its respective successors and assigns permitted hereby) to any claim, cause of action, remedy or right of any kind.

6

6.4.   <u>Notices</u>.  All notices, requests, demands and other communications required or permitted hereunder shall be made in writing and shall be deemed to have been duly given and effective:  (a) on the date of delivery, if delivered personally; (b) on the earlier of the fourth (4th) day after mailing or the date of the return receipt acknowledgment, if mailed, postage prepaid, by certified or registered mail, return receipt requested; (c) on the date of transmission, if sent by facsimile (provided such facsimile is received during normal business hours); or (d) on the date of delivery if sent by a recognized overnight courier:

        If to Assignor, to:

                        Dr. Rudolf W. Gunnerman
                        c/o SulphCo, Inc.
                        850 Spice Islands Drive
                        Sparks, NV 89431

        If to Assignee, to:

                        Capital Strategies Fund, Ltd.
                        c/o Oppenheimer Wolff & Donnelly LLP
                        Plaza VII, Suite 3300
                        45 South Seventh Street
                        Minneapolis, Minnesota 55402-1609
                        Attn: Michael D. Zalk
                        Fax: (612) 607-7100

                With a copy to:

                        Oppenheimer Wolff & Donnelly LLP
                        45 S. Seventh Street, Suite 3300
                        Minneapolis, MN 55402-1609
                        Attn: Michael D. Zalk
                        Tel: 612-607-7517
                        Fax: 612-607-7100

or to such other person or address as a party shall furnish to the other party in writing in accordance with this subsection.

6.5.   <u>Assignment</u>.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned (whether voluntarily, involuntarily, by operation of law, or otherwise) by any of the parties hereto without the prior written consent of the other parties; <u>provided</u>, <u>however</u>, that Assignee may assign this Agreement, in whole or in any part, and from time to time, to a subsidiary or affiliate of Assignee.

6.6.   <u>Governing Law</u>.  This Agreement and the legal relations among the parties hereto shall be governed by and construed in accordance with the internal substantive laws of the State of Delaware (without regard to the laws of conflict that might otherwise apply) as to all matters, including matters of validity, construction, effect, performance and remedies.

6.7.   Counterparts.  This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

6.8.   Headings.  The table of contents and the headings of the sections and subsections of this Agreement are inserted for convenience of the parties only and shall not constitute a part hereof.

6.9.   Entire Agreement.  The Exhibits and other writings referred to in this Agreement or in any such Exhibit or other writing are part of this Agreement; together, with the Note Purchase Agreement and the documents referenced therein or related thereto, they embody the entire agreement and understanding of the parties hereto in respect of the transactions contemplated by this Agreement, and together they are referred to as "this Agreement" or "the Agreement."  There are no restrictions, promises, warranties, agreements, covenants or undertakings, other than those expressly set forth or referred to in this Agreement.  This Agreement supersedes all prior agreements and understandings between the parties with respect to the transaction or transactions contemplated by this Agreement.  Provisions of this Agreement shall be interpreted to be valid and enforceable under applicable Law to the extent that such interpretation does not materially alter this Agreement; provided, however, that if any such provision shall become invalid or unenforceable under applicable Law such provision shall be stricken to the extent necessary and the remainder of such provisions and the remainder of this Agreement shall continue in full force and effect.

6.10.  Injunctive Relief.  It is expressly agreed among the parties hereto that monetary damages would be inadequate to compensate a party hereto for any breach by Assignor of the covenants and agreements in Section 4 hereof.  Accordingly, the parties agree and acknowledge that any such violation or threatened violation will cause irreparable injury to Assignee and that, in addition to any other remedies which may be available, Assignee shall be entitled to injunctive relief against the threatened breach of Section 4 hereof or the continuation of any such breach without the necessity of proving actual damages and may seek to specifically enforce the terms thereof.

6.11.  Waiver of Jury Trial.  The parties waive any right to a jury trial of any controversy or claim arising out of or relating to this Agreement, or the making, performance or interpretation thereof, including fraudulent inducement thereof.

*[Remainder of page intentionally left blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

ASSIGNOR:

By: _Dr. Rudolf W. Gunnerman_

ASSIGNEE:

CAPITAL STRATEGIES FUND, LTD.

By: Westford Asset Management LLC-
Investment Manager

By: _____
Name: Steve G. Stevanovich
Its:    President

9

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

ASSIGNOR:

ASSIGNEE:

CAPITAL STRATEGIES FUND, LTD.

By: _____
    Dr. Rudolf W. Gunnerman

By: Westford Asset Management LLC-
Investment Manager .

By: _____
Name: Steve G. Stevanovich
Its:   President

9

### ACKNOWLEDGMENT OF LICENSEE

Clean Fuels Technology, Inc., a Delaware corporation and the "Licensee" under that certain Exclusive License defined in the forgoing Technology Transfer and Assignment Agreement, dated April 23, 2003, between Dr. Rudolf W. Gunnerman ("Assignor") and Capital Strategies Fund, Ltd. ("Assignee") (the "Agreement"), does hereby acknowledge receipt of the Agreement, and represents and warrants to Assignor that (i) neither Assignor nor Licensee is in breach or default of any obligations under the Exclusive License, and (ii) there are no interference, reissue, reexamination, opposition, declaratory judgment or other invalidating proceeding, nor to the knowledge of Licensee, threatened, relating to the Intellectual Property Rights as defined in the Agreement.

Clean Fuels Technology, Inc.

By_____

Carlos V. Duno
Chief Executive Officer

10

Exhibit 2.1(i)

PATENT RIGHTS

| Serial No./ Patent No. | Country | Title | Filing Date/Issue Date |
|---|---|---|---|
| 5,156,114 | US | Aqueous Fuel for Internal Combustion Engine & Method of Combustion | 10/20/1992 |
| RE 35237 | US | Aqueous Fuel for Internal Combustion Engine & Method of Combustion | 05/14/1996 |
| 6,187,063 | US | Aqueous Emulsion Fuels from Petroleum Residuum-Based Fuel Oils | 02/13/2001 |
| 6,302,929 | US | Aqueous Fuel for Internal Combustion Engine & Method of Preparing Same | 10/16/2001 |
| 09/938,753 | US | Water-in-Oil Emulsion Fuel | |
| 10/114,426 | US | Diesel Fuel Recycling System and Apparatus to Reduce Vapor Emissions of Diesel Fuel | 01/09/2003 |
| 254246 | Argentina | Aqueous Fuel for Internal Combustion Engine & Method of Combustion | |
| 654941 | Australia | Aqueous Fuel for Internal Combustion Engine & Method of Combustion | 12/01/1994 |
| 687189 | Australia | Aqueous Fuel for Internal combustion Engine & Method of Preparing Same | 02/19/1998 |
| 57982/01 | Australia | Water-in-Oil-Emulsion Fuel | 02/20/2003 |
| 137529 | Austria | Aqueous Fuel for Internal Combustion Engine & Method of Combustion | 05/15/1996 |
| BE 0431357 | Belgium | Aqueous Fuel for Internal Combustion Engine & Method of Combustion | |
| 63466 | Bulgaria | Aqueous Fuel for Internal Combustion Engine & Method of Preparing Same | 02/28/2002 |
| 2029654 | Canada | Aqueous Fuel for Internal Combustion Engine & Method of Combustion | 05/23/1991 |
| 2187076 | Canada | Aqueous Fuel for Internal Combustion Engine and Method of Preparing Same | 10/12/1995 |
| 2293249 | Canada | Aqueous Emulsion Fuels from Petroleum Residuum-Based Fuel Oils | 04/22/1999 |
| 41.058 | Chile | Aqueous Fuel for Internal Combustion Engine & Method of Combustion | |
| 501-95 | Chile | Aqueous Fuel for Internal Combustion Engine & Method of Preparing Same | |
| 282364 | Czech Republic | Aqueous Fuel for Internal combustion Engine & Method of Combustion | 07/16/1997 |
| DK 0431357 | Denmark | Aqueous Fuel for Internal combustion Engine & Method of Combustion | 07/29/1996 |

Exhibit 2.1(i)-1

| Serial No./ Patent No. | Country | Title | Filing Date/Issue Date |
|---|---|---|---|
| 19428 | Egypt | Aqueous Fuel for Internal combustion Engine & Method of Combustion | 06/29/1995 |
| 431357 | European | Aqueous Fuel for Internal combustion Engine & Method of Combustion | 06/12/1991 |
| 9603957 | Finland | Vattenhaltigt Braensle Foer En Foerbraenningsmotor Och Foerfarande Foer Dess Framstaellning | 12/03/1996 |
| FR 0431357 | France | Aqueous Fuel for Internal combustion Engine & Method of Combustion | 05/21/1968 |
| 69026797 | Germany | Aqueous Fuel for Internal Combustion Engine & Method of Combustion | 09/05/1996 |
| GR 0431357 | Greece | Aqueous Fuel for Internal combustion Engine & Method of Combustion | 05/21/1968 |
| 105553.8 | Hong Kong | Aqueous Emulsion Fuels from Petroleum Residuum-Based Fuel Oils | |
| 217788 | Hungary | Aqueous Fuel for Internal Combustion Engine & Method of Preparing Same | 04/28/2000 |
| 178023 | India | Aqueous Fuel for Internal Combustion Engine & Method of Combustion | 03/01/1997 |
| 183419 | India | Aqueous Fuel for Internal Combustion Engine & Method of Combustion | |
| 563/DEL/95 | India | Aqueous Fuel for Internal Combustion Engine & Method of Preparing Same | |
| 9900015 | India | Aqueous Emulsion Fuels from Petroleum Residuum-Based Fuel Oils | |
| 840/DEL/2001 | India | Water-in-Oil-Emulsion Fuel | |
| ID0000765 | Indonesia | Aqueous Fuel for Internal combustion Engine & Method of Combustion | |
| P-950539 | Indonesia | Aqueous Fuel for Internal Combustion Engine & Method of Preparing Same | |
| 24557 | Iran | Aqueous Fuel for Internal combustion Engine & Method of Combustion | |
| 113176 | Israel | Aqueous Fuel for Internal Combustion Engine & Method of Preparing Same | 06/29/1995 |
| 23196/BE/96 | Italy | Aqueous Fuel for Internal combustion Engine & Method of Combustion | |
| 3233630 | Japan | Aqueous Fuel for Internal combustion Engine & Method of Combustion | 11/26/2001 |
| 2968589 | Japan | Aqueous Fuel for Internal Combustion Engine & Method of Preparing Same | 10/25/1999 |
| 11-553189 | Japan | Aqueous Emulsion Fuels from Petroleum Residuum-Based Fuel Oils | |
| 238/91 | Libya | Aqueous Fuel for Internal Combustion Engine & Method of Combustion | |

Exhibit 2.1(i)-2

| Serial No./ Patent No. | Country | Title | Filing Date/Issue Date |
|---|---|---|---|
| LU 0431357 | Luxembourg | Aqueous Fuel for Internal combustion Engine & Method of Combustion | 05/21/1968 |
| MY108896A | Malaysia | Aqueous Fuel for Internal combustion Engine & Method of Combustion | |
| PI 9500829 | Malaysia | Aqueous Fuel for Internal Combustion Engine & Method of Preparing Same | |
| 172598 | Mexico | Aqueous Fuel for Internal combustion Engine & Method of Combustion | 01/03/1994 |
| 179809 | Mexico | Aqueous Fuel for Internal combustion Engine & Method of Combustion | |
| 964555 | Mexico | Aqueous Fuel for Internal Combustion Engine & Method of Preparing Same | |
| 9911986 | Mexico | Aqueous Emulsion Fuels from Petroleum Residuum-Based Fuel Oils | |
| 1580 | Mongolia | Aqueous Fuel for Internal Combustion Engine & Method of Preparing Same | |
| 22158 | Morocco | Aqueous Fuel for Internal combustion Engine & Method of Combustion | |
| NL 0431357 | Netherlands | Aqueous Fuel for Internal combustion Engine & Method of Combustion | |
| 250641 | New Zealand | Aqueous Fuel for Internal combustion Engine & Method of Combustion | 07/26/1995 |
| 283877 | New Zealand | Aqueous Fuel for Internal Combustion Engine & Method of Preparing Same | 09/22/1997 |
| 305289 | Norway | Aqueous Fuel for Internal combustion Engine & Method of Combustion | 05/03/1999 |
| 9604163 | Norway | Vandig Drivstoff for Forbrenningsmotor Og Fremgangsmaate for Fremstilling Derav | 10/02/1996 |
| 1-1991-42528 | Philippines | Aqueous Fuel for Internal combustion Engine & Method of Combustion | |
| 1-1995-50204 | Philippines | Aqueous Fuel for Internal combustion Engine & Method of Preparing Same | |
| 1-2001-02056 | Philippines | Water-in-Oil-Emulsion Fuel | |
| 165835 | Poland | Aqueous Fuel for Internal combustion Engine & Method of Combustion | 02/28/1995 |
| 179945 | Poland | Aqueous Fuel for Internal Combustion Engine & Method of Preparing Same | 11/30/2000 |
| 97742 | Portugal | Aqueous Fuel for Internal combustion Engine & Method of Combustion | 07/30/1993 |
| 140975 | Republic of Korea (South) | Aqueous Fuel for Internal combustion Engine & Method of Combustion | 07/01/1998 |

Exhibit 2.1(i)-3

AMENDMENT OF

TECHNOLOGY TRANSFER AND ASSIGNMENT AGREEMENT

This agreement amends the Technology Transfer and Assignment Agreement between Capital Strategies Fund, Inc. ("Capital") and Rudolf W. Gunnerman ("Gunnerman")

RECITALS

A.    Pursuant to a Technology Transfer and Assignment Agreement, dated April 23, 2003, between Gunnerman, as Assignor, and Capital, as Assignee (the "Gunnerman Assignment Agreement"), Capital acquired certain "Assigned Assets" as defined in the Gunnerman Assignment Agreement. The Assigned Assets include all of Gunnerman's right, title and interest under that certain Exclusive License Agreement, dated January 3, 1994 (and as amended effective January 1, 1995, July 31, 1998, January 27, 1999 and April 30, 2001) (as so amended, the "Exclusive License") with A-55, Inc., now known as Clean Fuels Technology, Inc. ("CFT").

B.    In connection with the foregoing transactions, the Gunnerman Assignment Agreement is herein amended to clarify the Gunnerman Assignment Agreement.

SECTION 1

1.    DEFINITIONS

1.1    Terms Incorporated.  Capitalized terms used but not defined herein will have the meaning provided in the Gunnerman Assignment Agreement.

SECTION 2

2.    . AMENDMENT OF TECHNOLOGY TRANSFER AND ASSIGNMENT AGREEMENT

2.1    Gunnerman and Capital hereby agree to amend the Gunnerman Assignment Agreement, effective retroactively to the date of the Gunnerman Assignment Agreement, as

follows:

(a) The "Transfer and Assignment of Intellectual Property Rights" clause, paragraph

2.1, shall be replaced in whole as follows:

2.1.   Transfer and Assignment of Intellectual Property Rights. Subject to the terms and conditions of this Agreement, Assignor hereby agrees to assign and herby so assigns, transfers, conveys and delivers to Assignee and Assignee hereby acquires from Assignor, free and clear of any mortgage, lien, pledge, option, security interest, claim, charge or other encumbrance of any kind whatsoever, whether or not of record (collectively, "Encumbrances") (other than the Exclusive License) all of Assignor's present and future right, title and interest in and to the following, unless otherwise specified (collectively, the "Assigned Assets"):

(i)   all patent applications and patent rights, as well as all reissues, divisionals, continuations and continuations-in-part thereof, any corresponding foreign patent rights and any other patents issuing thereon or claiming priority therefrom, that relate to the Field (collectively, all of the foregoing being the "Patent Rights"). Without limitation, the patents and applications specifically identified on Exhibit 2.1(i) are Patent Rights;

(ii)   any common law and registered trademarks and unregistered trademarks, logos, service marks, trade dress and trade names, and all associated goodwill, and all applications, registration certificates, Section 8 affidavits, renewals, investigations, search reports, histories and other documents that relate to the Field or to aqueous or oil/fuel based emulsions or files subject to the Exclusive License (the "Trademarks");

(iii)   all copyright registrations and applications used or held for use by Assignor and any other non-registered copyrights or copyrightable works that relate to the Field or to aqueous or oil/fuel based emulsions (collectively, the "Copyrights");

(iv)   all technical information and know-how, confidential and non-confidential, that relates to the Field, including all computer software, patterns, plans, designs, research data, trade secrets, formulae, drawings, instructions, manuals, data, records and other documents relating to the foregoing (collectively, the "Know-How,")(the Know-How, Copyrights, Trademarks and Patent Rights are referred to collectively as the "Intellectual Property Rights"). Specifically

transferred is all Know-How that relates to aqueous or fuel/oil based emulsions.

(v)    all license agreements, including the Exclusive License, assignments of inventions and other agreements which relate to the Intellectual Property Rights;

(vi)    all restrictions on competition and obligations regarding confidentiality pertaining to the Intellectual Property Rights imposed on third parties by Assignor; and

(vii)    all rights to enforce, claims, credits, causes of action, and rights to damages, profits or set-off whatsoever, whether known or unknown, relating to the Intellectual Property Rights.

(b)    The "Further Assurances" clause, paragraph 2.5, shall be replaced in whole as follows:

2.5    Further Assurances.  From and after the date hereof, Assignor shall from time to time, at the request of Assignee and at Assignee's cost, execute and deliver such other instruments of conveyance, assignment and transfer as Assignee may reasonably request in order to more effectively consummate the transactions contemplated herein and to vest in Assignee good and marketable title to the Assigned Assets.  Assignee shall be responsible for preparing such instruments of conveyance, and for recording the same, including paying any and all costs incurred in connection with such activities.  Assignor shall cooperate in any reasonable arrangement to the end that Assignee shall be provided the full use and benefits of such Assigned Assets as contemplated by this Agreement.

(c)    The "Disclosure" clause, paragraph 4.2, shall be eliminated and replaced with the following:

4.2    This paragraph is intentionally left blank.

(d)    The "Assignment" clause, paragraph 6.5, shall be replaced in whole as follows:

6.5    Assignment.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representative, successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned (whether voluntarily,

involuntarily, by operation of law, or otherwise) by Assignor without the prior written consent of the Assignee or the Assignee's assigns.

(e)    Amend Exhibit 2.1(i) as follows:

(1) delete the following patent application from the list of Patent Rights

| 10/114,426 | US | Diesel Fuel Recycling System and Apparatus to Reduce Vapor Emissions of Diesel Fuel | 01/09/2003 |

(2) add the following patent application to the list of Patent Rights:

| 10/659,046 | US | Method for Manufacturing an Emulsified Fuel | To be filed (actual filing date 9/9/03) |

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed, and made effective as of the day and year first above written.

_____
Rudolf W. Gunnerman

CAPITAL STRATEGIES FUND, LTD.

By:  Westford  Asset  Management  LLC-
Investment Manager

By: _____
Name:  Steve G. Stevanovich
Its:    President

_____

JOANNA L. CLONINGER
Notary Public - State of Nevada
Appointment Number 93-0533-2
My Appt. Expires Sept. 7, 2005

# EXHIBIT 5

## TERMINATION AND RELEASE

This TERMINATION AND RELEASE (the "Agreement") dated as of April 23, 2003, by and among CLEAN FUELS TECHNOLOGY, INC. ("Company"), and RUDOLF W. GUNNERMAN ("Gunnerman") and RWG, INC. (collectively with Gunnerman, the "Consultant").

### RECITALS:

A.    Company and Gunnerman have entered into that certain Consulting Agreement, dated December 4, 2000 (the "Contract").

B.    Company and Consultant each desire to cease further performance by the parties on the Contract, while preserving and amending certain provisions of the Contract intended to survive termination.

C.    Gunnerman has agreed to release Company from certain distributions payable to him (the "Distribution Payable") relating to distributions owed by A-55 L.P., a predecessor of the Company, pursuant to its limited partnership agreement, which the parties estimate are in the approximate amount of $1,250,000.

D.    Gunnerman has agreed to release Company from any obligation to pay on his behalf, or to reimburse him with respect to, (i) the judgment, plus interest and attorney's fees owing with respect to the case captioned Basic Capital Management Inc., vs. Rudolph [sic] W. Gunnerman, Case No. CV02-03494 in the Second Judicial District Court of the State of Nevada in and for the County of Washoe, enforcing the judgment from Rudolf W. Gunnerman, et. al., Plaintiffs and Counter-defendants, vs. Basic Capital Management Inc., Defendant and Counter Plaintiff. Cause No. 01-970 in the District Court, Dallas County, Texas, 14th Judicial District, and (ii) any amounts relating to the settlement of the case captioned Franz Weber, and Franz Weber and Janett Weber, in their capacity as Trustees of the Weber-Zermani Family Trust vs. Rudolf W. Gunnerman, et. al, Case No. CV02-05757 in the Second Judicial District Court of the State of Nevada in and for the County of Washoe (the "Litigation Costs").

E.    The execution and delivery of this Agreement is a condition to the obligations of Capital Strategies Fund, Ltd. under that certain Note Purchase Agreement, of even date herewith, among that entity and Gunnerman providing for the purchase of certain indebtedness of the Company.

NOW THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged, Company and Consultant do hereby agree as follows:

Section. 1.    Termination of Contract; Surviving Provisions.

a.    The Contract is hereby terminated. No party has any further obligations with respect to the Contract other than as set forth in subsection 1(b) hereof. No accrued and unpaid fees shall be payable under the Contract.

1

b. The following sections of the Contract shall survive termination and continue following the date hereof (indefinitely, unless such Section expressly provides for earlier termination): Section 8 ("Inventions and Improvements") and Section 11 ("Restrictive Covenants"); provided that the first sentence of Section 11(b) shall be amended and restated to read as follows:

"During Dr. Gunnerman's retention by the Company and for a period of three (3) years after termination, Dr. Gunnerman shall not, directly or indirectly, without the prior written consent of the Company, enter into Competition with the Company or its affiliates."

The parties hereto agree that "termination" as used in the Contract shall mean the date of this Agreement. The parties hereto further agree that the term "Field" as used in the Contract, shall not include the "SulphCo Field", as defined in Exhibit A attached hereto. In 2000 Dr. Gunnerman made a presentation regarding the SulphCo technology to the Clean Fuels board. He stated (1) that the SulphCo technology was separate and distinct from the Clean Fuels technology; (2) that the SulphCo technology had been developed exclusively with his independent resources and not utilizing any resources of Clean Fuels; and therefore (3) the SulphCo technology did not present a corporate opportunity to Clean Fuels. Relying on those representations, the independent directors of the Board agreed that he could independently pursue it.

Section. 2.    Release by Consultant. Each of Gunnerman and RWG, Inc. do hereby fully release and forever discharge Company and its directors, officers and employees in their capacities as such, from any and all manner of action and actions, causes, causes of action, suits, debts, duties, dues, sums of money, accounts, bonds, bills, covenants, contracts, controversies, agreements, promises, executions, claims and demands of any kind or nature whatsoever, past, present or future, in law or in equity, known or unknown, against any Company, based on or arising out of (i) the Contract, (ii) the Distribution Payable, (iii) the Litigation Costs, (iv) any obligation to indemnify Gunnerman or RWG, Inc. other than pursuant to the D&O Indemnity (as defined below), and (v) any other debt or obligation by the Company to Gunnerman or RWG, Inc. (collectively, the "Claims").

Section. 3.    Continuing Indemnity. The Company and Gunnerman agree that the Indemnification Agreement, of even date herewith, by and between the Company and Gunnerman in the form attached hereto as Exhibit B (the "D&O Indemnity") shall continue following the date hereof pursuant to its terms.

Section. 4.    Representations and Warranties. The parties represent, warrant and agree that in executing and entering into this Agreement, they are not relying and have not relied upon any representation, promise or statement made by anyone other than as set forth in this Agreement. The parties understand and expressly assume the risk that any fact not recited, contained or embodied herein may turn out hereafter to be other than, different from, or contrary to the facts now known or believed by to be true. Nevertheless, the parties intend by this Agreement to release fully, finally and forever all Claims and agree that this Agreement will be effective in all respects notwithstanding any such difference in facts, and will not be subject to termination, modification or rescission by reason of any such difference in facts.

2

Section. 5.    <u>Governing Law</u>. This Agreement and the legal relations among the parties hereto shall be governed by and construed in accordance with the internal substantive laws of the State of Delaware (without regard to the laws of conflict that might otherwise apply) as to all matters, including matters of validity, construction, effect, performance and remedies.

Section. 6.    <u>Counterpart Signatures</u>.  This Agreement may be executed in several counterparts, each of which shall, for all purposes, be deemed an original and all of such counterparts, taken together, shall constitute one and the same agreement, even though both of the parties hereto may not have executed the same counterpart of this Agreement.

[Signature page follows.]

IN WITNESS WHEREOF, the undersigned have executed this Agreement on behalf of the parties hereto as of the date first written above.

CLEAN FUELS TECHNOLOGY, INC.

By: _____

Carlos V. Duno
Chief Executive Officer


_____

Rudolf W. Gunnerman


RWG, INC.

By:_____

Rudolf W. Gunnerman, its President

4

IN WITNESS WHEREOF, the undersigned have executed this Agreement on behalf of the parties hereto as of the date first written above.

CLEAN FUELS TECHNOLOGY, INC.

By:_____
Its: _____

_____
Rudolf W. Gunnerman

RWG, INC.

By: _____
Rudolf W. Gunnerman, its President

4

EXHIBIT A

DESCRIPTION OF SULPHCO FIELD

The SulphCo Field shall be defined as:

The treatment of petroleum products (including but not limited to crude oil and fractions thereof), coal (including all slurry forms of coal), and/or natural gases for the reduction of one or more of:

Sulfur or sulfur-containing compounds;
Metals, including, but not limited to , aluminum and vanadium;
Salts, including but not limited to , sodium salts;
Nitrogen or nitrogen-containing substances;
Levels of acidity; and/or for
Increasing the API (or decreasing the specific gravity) of those substances.

The SulphCo Field shall also include the generation of hydrogen from substances through the use of ultrasound.

The SulphCo Field specifically includes all rights pertaining to U.S. patents 6,402,939 and 6,500,219, and United States published patent application 20030051988, and any United States or foreign patents or patent applications corresponding thereto or claiming priority therefrom, together with such other patent applications that may a pending relating to the SulphCo Field and in which Consultant or any of Consultant's assignees possess rights.

The SulphCo Field shall be deemed to include all compositions, methods, processes, technologies, and equipment or apparatuses pertaining to the above definition.

EXHIBIT B

FORM OF INDEMNITY AGREEMENT

1293640 v06 04/18/2003

CLEAN FUELS TECHNOLOGY, INC.

INDEMNIFICATION AGREEMENT

This Indemnification Agreement ("Agreement") is effective as of April 23, 2003, by and between Clean Fuels technology, Inc. (formerly A-55, Inc.), a Delaware corporation (the "Company"), and Rudolf W. Gunnerman ("Indemnitee").

WHEREAS, the Company and Indemnitee recognize the substantial increase in corporate litigation subjecting directors, officers, employees, agents and fiduciaries to expensive litigation risks;

WHEREAS, Indemnitee has served as a director, officer, employee, agent and fiduciary of the Company;

WHEREAS, in view of the considerations set forth above, the Company desires that Indemnitee shall be indemnified by the Company as set forth herein.

NOW, THEREFORE, the Company and Indemnitee agree as follows:

1.    Indemnification.

(a)    Indemnification of Expenses. Subject to subsection 1(d) hereof, the Company shall indemnify Indemnitee to the fullest extent permitted by law if Indemnitee was or is or becomes a party to or witness or other participant in, or is threatened to be made a party to or witness or other participant in, any threatened, pending or completed action, suit, proceeding or alternative dispute resolution mechanism, whether civil, criminal, administrative, investigative or other (hereinafter a "Claim") by reason of (or arising in part out of) any event or occurrence related to the fact that Indemnitee is or was a director, officer, employee, agent or fiduciary of the Company and its predecessors A-55, L.P. and A-55, Inc. (the "Predecessors"), or any subsidiary of the Company, or is or was serving at the request of the Company, as a director, officer, employee, agent or fiduciary of another corporation, partnership, limited liability company, joint venture, trust or other enterprise, or by reason of any action or inaction on the part of Indemnitee while serving in such capacity (hereinafter an "Indemnifiable Event"), against any and all expenses (including attorneys' fees and all other costs, expenses, and obligations incurred in connection with investigating, defending, being a witness in or participating in (including on appeal), or preparing to defend, be a witness in or participate in, any such action, suit, proceeding, alternative dispute resolution mechanism, hearing, inquiry or investigation), judgments, fines, penalties and amounts paid in settlement (if such settlement is approved in advance by the Company, which approval shall not be unreasonably withheld) of such claim and any federal, state, local or foreign taxes imposed on the Indemnitee as a result of the actual or deemed receipt of any payments under this Agreement, but only if Indemnitee acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interest of the Company, and, with respect to any criminal action or proceeding, Indemnitee had no reasonable cause to believe his conduct was unlawful (collectively, hereinafter "Expenses"), including all interest assessments and other charges paid or payable in connection with or in respect of such Expenses. Such payment of Expenses shall be made by the Company as soon

as practicable but in any event no longer than fifteen (15) days after written demand by Indemnitee therefore is presented to the Company.

      (b)   <u>Independent Legal Counsel</u>. Notwithstanding the foregoing, (i) the obligations of the Company under Section 1(a) shall be subject to the conditions that Independent Legal Counsel (as described in Section 9(c) hereof), shall not have determined in a written opinion that Indemnitee would not be permitted to be indemnified under applicable law, and (ii) the obligation of the Company to make an advance payment of Expenses to Indemnitee pursuant to Section 2(a) (an "Expense Advance") shall be subject to the condition that, if, when and to the extent that Independent Legal Counsel determines that Indemnitee would not be permitted to be so indemnified under applicable law, the Company shall be entitled to be reimbursed by Indemnitee (who hereby agrees to reimburse the Company) for all such amounts theretofore paid or advanced; provided, however, that if Indemnitee has commenced or thereafter commences legal proceedings in a court of competent jurisdiction to secure a determination that Indemnitee should be indemnified under applicable law, any determination made by Independent Legal Counsel that Indemnitee would not be permitted to be indemnified under applicable law shall not be binding and Indemnitee shall not be required to reimburse the Company for any Expense Advance or payment of Expenses until a final judicial determination is made with respect thereto (as to which all rights of appeal therefrom have been exhausted or lapsed). Indemnitee's obligation to reimburse the Company for any Expense Advance or payment of Expenses shall be unsecured and no interest shall be charged thereon. Independent Legal Counsel shall be selected by the Board of Directors, with the consent of Indemnitee which shall not be unreasonably withheld. If there has been no determination by Independent Legal Counsel or if Independent Legal Counsel determines that Indemnitee substantively would not be permitted to be indemnified in whole or in part under applicable law, Indemnitee shall have the right, within twelve (12) months of a refusal by Independent Legal Counsel to make a determination or Independent Legal Counsel's making a determination, as appropriate, to commence litigation seeking an initial determination by the court or challenging any such determination by Independent Legal Counsel or any aspect thereof, including the legal or factual basis therefore, and the Company hereby consents to service of process and to appear in any such proceeding. Any determination by Independent Legal Counsel otherwise shall be conclusive and binding on the Company and Indemnitee. The Company agrees to pay the reasonable fees of the Independent Legal Counsel referred to above and to fully indemnify such counsel against any and all expenses (including attorneys' fees), claims, liabilities and damages arising out of or relating to this Agreement or its engagement pursuant hereto.

      (c)   <u>Mandatory Payment of Expenses</u>. Notwithstanding any other provision of this Agreement, to the extent that Indemnitee has been successful on the merits or otherwise, including, without limitation, the dismissal of an action without prejudice, in defense of any Claim or in the defense of any claim, issue or matter therein, Indemnitee shall be indemnified against all Expenses incurred by Indemnitee in connection therewith subject to the limitation of subsection 1(d) hereof.

      (d)   <u>Limitation of Obligation</u>. Unless the Company is in breach of performance of the covenant in Section 8 hereof, the Company's obligation hereunder

shall be limited to amounts paid pursuant to the Policy (as defined in Section 8) and the self-insured retention described therein.

2.    Expenses: Indemnification Procedures.

(a)    Advancement of Expenses.  Subject to Section 1(b) and 1(d), the Company shall advance all Expenses incurred by Indemnitee.  The advances to be made hereunder shall be paid by the Company to Indemnitee as soon as practicable but in any event no later than fifteen (15) days after written demand by Indemnitee therefor to the Company.

(b)    Notice/Cooperation by Indemnitee.  Indemnitee shall give the Company notice in writing as soon as practicable of any Claim made against Indemnitee for which indemnification will or could be sought under this Agreement.  Notice to the Company shall be directed to the Chief Executive Officer of the Company (or to the President of the Company in the event that the Indemnitee is the Chief Executive Officer of the Company) at the address shown on the signature page of this Agreement (or such other address as the Company shall designate in writing to Indemnitee).  In addition, Indemnitee shall give the Company such information and cooperation as it may reasonably require and as shall be within Indemnitee's power.

(c)    No Presumptions; Burden of Proof.  For purposes of this Agreement, the termination of any Claim by judgment, order, settlement (whether with or without court approval) or conviction, or upon a plea of nolo contendere or its equivalent, shall not create a presumption that Indemnitee did not meet any particular standard of conduct or have any particular belief or that a court has determined that indemnification is not permitted by applicable law.  In addition, neither the failure of Independent Legal Counsel to have made a determination as to whether Indemnitee has met any particular standard of conduct or had any particular belief, nor an actual determination by Independent Legal Counsel that Indemnitee has not met such standard of conduct or did not have such belief, prior to the commencement of legal proceedings by Indemnitee to secure a judicial determination that Indemnitee should be indemnified under applicable law, shall be a defense to Indemnitee's claim or create a presumption that Indemnitee has not met any particular standard of conduct or did not have any particular belief.  In connection with any determination by Independent Legal Counsel or otherwise as to whether the Indemnitee is entitled to be indemnified hereunder, the burden of proof shall be on the Company to establish that Indemnitee is not so entitled.

(d)    Notice to Insurers.  If, at the time of the receipt by the Company of a notice of a Claim pursuant to Section 2(b) hereof, the Company has liability insurance in effect which may cover such Claim, the Company shall give prompt notice of the commencement of such Claim to the insurers in accordance with the procedures set forth in the respective policies.  The Company shall thereafter take all necessary or desirable action to cause such insurers to pay, on behalf of the Indemnitee, all amounts payable as a result of Claim in accordance with the terms of such policies.

(e)    Selection of Counsel.  In the event the Company shall be obligated hereunder to pay the Expenses of any Claim, the Company, if appropriate, shall be entitled to assume the defense of such Claim with counsel approved by Indemnitee, upon

3

the delivery to Indemnitee of written notice of its election so to do. After delivery of such notice, approval of such counsel by Indemnitee and the retention of such counsel by the Company, the Company will not be liable to Indemnitee under this Agreement for any fees of counsel subsequently incurred by Indemnitee with respect to the same Claim; provided that, Indemnitee shall have the right to employ separate counsel in any such Claim at Indemnitee's expense. If (i) the employment of separate counsel by Indemnitee has been previously authorized by the Company, (ii) Indemnitee shall have reasonably concluded that there may be a conflict of interest between the Company and Indemnitee in the conduct of any such defense, or (iii) the Company, in breach of its obligation under this Agreement, shall not continue to retain such separate counsel to defend such Claim, then the fees and expenses of Indemnitee's counsel shall be at the expense of the Company and reimburse to Indemnitee as an Expense pursuant to Section 1(a) above.

3.    Exclusivity.  This Agreement constitutes the entire understanding and agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the parties with respect hereto and thereto. The indemnification provided under this Agreement shall continue as to Indemnitee for any action taken or not taken in connection with an Indemnifiable Event while serving in the capacities specified in Section 1(a) even though Indemnitee has as of the date hereof ceased to serve in any such capacity.

4.    No Duplication of Payments.  The Company shall not be liable under this Agreement to make any payment in connection with any Claim made against Indemnitee to the extent Indemnitee has otherwise actually received payment (under any insurance policy or otherwise) of the amounts otherwise indemnifiable hereunder.

5.    Partial Indemnification.  If Indemnitee is entitled under any provision of this Agreement to indemnification by the Company for some portion of Expenses incurred in connection with any Claim, but not, however, for all of the total amount thereof, the Company shall nevertheless indemnify Indemnitee for the portion of such Expenses to which Indemnitee is entitled.

6.    Mutual Acknowledgement.  Both the Company and Indemnitee acknowledge that in certain instances, federal law or applicable public policy may prohibit the Company from indemnifying its directors, officers, employees, agents or fiduciaries under this Agreement or otherwise. Indemnitee understands and acknowledges that the Company has undertaken or may be required in the future to undertake with the Securities and Exchange Commission to submit the question of indemnification to a court in certain circumstances for a determination of the Company's authority under public policy to indemnify Indemnitee.

7.    Exceptions.  Any other provision herein to the contrary notwithstanding, the Company shall not be obligated pursuant to the terms of this Agreement:

(a)    Excluded Action or Omissions.  To indemnify Indemnitee for acts, omissions or transactions from which Indemnitee may not be relieved of liability under applicable law.

4

(b)    <u>Claims Initiated by Indemnitee</u>.  To indemnify or advance Expenses to Indemnitee with respect to Claims initiated or brought voluntarily by Indemnitee and not by way of defense, except with respect to actions or proceedings brought to establish or enforce a right to indemnification under this Agreement.

(c)    <u>Lack of Good Faith</u>.  To indemnify Indemnitee for any Expenses incurred by the Indemnitee with respect to any proceeding instituted by Indemnitee to enforce or interpret this Agreement, if a court of competent jurisdiction determines that each of the material assertions made by the Indemnitee in such proceeding was not made in good faith or was frivolous.

(d)    <u>Claims Under Section 16(b)</u>.  To indemnify Indemnitee for expenses and the payment of profits arising from the purchase and sale by Indemnitee of securities in violation of Section 16(b) of the Securities and Exchange Act of 1934, as amended, or any similar successor statute.

(e)    <u>Released Obligations</u>.  To indemnify Indemnitee for (i) any Expenses related to (A) the case captioned <u>Basic Capital Management Inc., vs. Rudolph [sic] W. Gunnerman</u>, Case No. CV02-03494 in the Second Judicial District Court of the State of Nevada in and for the County of Washoe, enforcing the judgment from <u>Rudolf W. Gunnerman, et. al., Plaintiffs and Counter-defendants, vs. Basic Capital Management Inc., Defendant and Counter Plaintiff</u>., Cause No. 01-970 in the District Court, Dallas County, Texas, 14th Judicial District, or (B) any amounts relating to the settlement of the case captioned <u>Franz Weber, and Franz Weber and Janett Weber, in their capacity as Trustees of the Weber-Zermani Family Trust vs. Rudolf W. Gunnerman</u>, et. al, Case No. CV02-05757 in the Second Judicial District Court of the State of Nevada in and for the County of Washoe, or (iii) any other claim that was released by Indemnitee pursuant to that certain Termination and Release, between Company and Indemnitee, of even date herewith.

8.    <u>Directors and Officers Liability Insurance</u>.  For the period commencing the date hereof and ending on the third (3rd) anniversary of the date hereof, the Company shall (i) purchase and maintain a policy of directors and officers liability insurance (the "Policy") which provides substantially the same scope and amount coverage, including "Individual Insured Insurance", and allows for substantially the same self-insured retention, as is provided by the "Private Edge Directors, Officers and Private Company Liability" policy issued by National Union Fire Insurance Company of Pittsburgh, PA to the Company for the policy term of December 31, 2002 to December 31, 2003, or (ii) at the option of the Company, shall purchase and maintain rights under the Policy to an "Extended Reporting Period" (ERP) that does not expire prior to such third (3rd) anniversary; provided, however, that the obligation set forth in this Section shall not require that the Company pay annual premiums in excess of $125,000 (the "Maximum Premium") for the Policy or any ERP, and the Company shall have satisfied its obligation under this Section 8 if it has purchased a lesser dollar amount of coverage for the Maximum Premium.

9.    <u>Construction of Certain Phrases</u>:

(a)    For purposes of this Agreement, "Business Combination" shall mean a merger or consolidation of the Company and one or more other entities in which the Company or a subsidiary of the Company is a merging or consolidating party.

(b)    For purposes of this Agreement, reference to the "Company" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) limited partnership or limited liability company absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, employees, agents or fiduciaries, so that if Indemnitee is or was a director, officer, employee, agent or fiduciary of such constituent entity, or is or was serving at the request of such constituent entity as a director, officer, employee, agent or fiduciary of another corporation, partnership, limited liability company, joint venture, employee benefit plan, trust or other enterprise, Indemnitee shall stand in the same position under the provisions of this Agreement with respect to the resulting of surviving corporation as Indemnitee would have with respect to such constituent entity if its separate existence had continued.

(c)    For purposes of this Agreement, "Independent Legal Counsel" shall mean an attorney or firm of attorneys, selected in accordance with the provisions of Section 1(b) hereof, who shall not have otherwise performed services for the Company or Indemnitee within the last three (3) years (other than with respect to serving as "Independent Legal Counsel" under this or other similar indemnity agreements to which the Company is a party).

(d)    For purposes of this Agreement, references to "other enterprises" shall include employee benefit plans; references to "fines" shall include any excise taxes assessed on Indemnitee with respect to an employee benefit plan; and references to "serving at the request of the Company" shall include any service as a director, officer, employee, agent or fiduciary of the Company which imposes duties on, or involves services by, such director, officer, employee, agent or fiduciary with respect to an employee benefit plan, its participants or its beneficiaries; and if Indemnitee acted in good faith and in a manner Indemnitee reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan, Indemnitee shall be deemed to have acted in a manner "not opposed to the best interests of the Company" as referred to in this Agreement.

(e)    For purposes of this agreement, "Successor Entity" shall mean a corporation or other entity other than the Company that acquires all or substantially all of the assets of the Company, or which is the surviving or parent entity resulting from a Business Combination.

10.    Binding Effect; Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors, assigns, including any direct or indirect Successor Entity, spouses, heirs, and personal and legal representatives.

11.    Attorneys' Fees. In the event that any action is instituted by Indemnitee under this Agreement or under any liability insurance policies maintained by the Company to enforce or interpret any of the terms hereof or thereof, Indemnitee shall be entitled to

be paid all Expenses incurred by Indemnitee with respect to such action, regardless of whether Indemnitee is ultimately successful in such action, and shall be entitled to the advancement of Expenses with respect to such action, unless as a part of such action a court of competent jurisdiction over such action determines that each of the material assertions made by Indemnitee as a basis for such action were not made in good faith or were frivolous. In the event of an action instituted by or in the name of the Company under this Agreement to enforce or interpret any of the terms of this Agreement, Indemnitee shall be entitled to be paid all Expenses incurred by Indemnitee in defense of such action (including costs and expenses incurred with respect to Indemnitee's counterclaims and cross-claims made in such action), and shall be entitled to the advancement of Expenses with respect to such action, unless as a part of such action a court having jurisdiction over such action determines that each of Indemnitee's material defenses to such action were made in bad faith or were frivolous.

12.    Notice.  All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed duly given (i) if personally delivered on the date of such delivery, or (ii) if mailed by domestic certified or registered mail with postage prepaid, on the third business day after the date postmarked. Addresses for notice to either party are as shown on the signature page of this Agreement, or as subsequently modified by written notice.

13.    Severability.  The provisions of this Agreement shall be severable in the event that any of the provisions hereof (including any provision within a single section, paragraph or sentence) are held by a court of competent jurisdiction to be invalid, void or otherwise unenforceable, and the remaining provisions shall remain enforceable to the fullest extent permitted by law.  Furthermore, to the fullest extent possible, the provisions of this Agreement (including, without limitations, each portion of this Agreement containing any provision held to be invalid, void or otherwise unenforceable, that is not itself invalid, void or unenforceable) shall be construed so as to give effect to the intent manifested by the provision held invalid, illegal or unenforceable.

14.    Choice of Law.  This Agreement shall be governed by and its provisions construed and enforced in accordance with the laws of the State of Delaware, as applied to contracts between Delaware residents, entered into and to be performed entirely within the State of Delaware, without regard to the conflict of laws principles thereof.

15.    Subrogation.  In the event of payment under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee, who shall execute all documents required and shall do all acts that may be necessary to secure such rights and to enable the Company effectively to bring suit to enforce such rights.

16.    Amendment and Termination.  No amendment, modification, termination or cancellation of this Agreement shall be effective unless it is in writing signed by both the parties hereto.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions hereof (whether or not similar) nor shall such waiver constitute a continuing waiver.

7

17.    <u>No Construction as Employment Agreement</u>. Nothing contained in this Agreement shall be construed as giving Indemnitee any right to be retained in the employ of the Company or any of its subsidiaries.

18.    <u>Counterparts</u>. This Agreement may be exercised in one or more counterparts, each of which shall constitute an original.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

CLEAN FUELS TECHNOLOGY, INC.

By: _____
Title: _____

Address:  210 Gentry Way
          Reno, Nevada 89502 USA

AGREED TO AND ACCEPTED:

INDEMNITEE:

_____
(signature)

Dr. Rudolf W. Gunnerman
(name of Indemnitee)

c/o SulphCo, Inc.
850 Spice Islands Drive
Sparks, NV  89431
(address)

8

# EXHIBIT 6

# AMENDMENT OF TECHNOLOGY TRANSFER AND ASSIGNMENT AGREEMENT

and

## ASSIGNMENT OF THE AMENDED AGREEMENT

This Agreement, effective July 7, 2004, amends the Technology Transfer and Assignment Agreement between Capital Strategies Fund, Inc. ("Capital") and Rudolf W. Gunnerman ("Gunnerman") and transfers that amended agreement to Talisman Capital Talon Fund, Ltd. ("Talisman"); consequently, signatories hereto include Gunnerman, Capital and Talisman.

### RECITALS

A.    Pursuant to a Technology Transfer and Assignment Agreement, dated April 23, 2003, between Gunnerman, as Assignor, and Capital, as Assignee (the "Gunnerman Assignment Agreement"), Capital acquired certain "Assigned Assets" as defined in the Gunnerman Assignment Agreement. The Assigned Assets include all of Gunnerman's right, title and interest under that certain Exclusive License Agreement, dated January 3, 1994 (and as amended effective January 1, 1995, July 31, 1998, January 27, 1999 and April 30, 2001) (as so amended, the "Exclusive License") with A-55, Inc., now known as Clean Fuels Technology, Inc. ("CFT").

B.    In connection with the foregoing transactions, the Gunnerman Assignment Agreement is herein amended to clarify the Gunnerman Assignment Agreement and allow for assignment of same to Talisman.

C.    In connection with the foregoing transactions, this Agreement sets forth the terms and conditions upon which Capital assigns and transfers to Talisman all of its present and future right, title and interest in and to the amended Gunnerman Assignment Agreement and the

Assigned Assets, including the Intellectual Property Rights defined or referenced below, and an assignment of Capital's rights and interest under the Exclusive License.

## AGREEMENT

In consideration of the representations, warranties, covenants and agreements contained herein, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

## SECTION 1

1.    DEFINITIONS

1.1    <u>Terms Incorporated</u>. Capitalized terms used but not defined herein will have the meaning provided in the Gunnerman Assignment Agreement.

## SECTION 2

2.    AMENDMENT OF TECHNOLOGY TRANSFER AND ASSIGNMENT AGREEMENT

2.1    Gunnerman and Capital hereby agree to amend the Gunnerman Assignment Agreement, effective retroactively to the date of the Gunnerman Assignment Agreement, as follows:

(a)    The "Transfer and Assignment of Intellectual Property Rights" clause, paragraph 2.1, shall be replaced in whole as follows:

> 2.1.    <u>Transfer and Assignment of Intellectual Property Rights</u>. Subject to the terms and conditions of this Agreement, Assignor hereby assigns, transfers, conveys and delivers to Assignee and Assignee hereby acquires from Assignor, free and clear of any mortgage, lien, pledge, option, security interest, claim, charge or other encumbrance of any kind whatsoever, whether or not of record (collectively, "<u>Encumbrances</u>") (other than the Exclusive License) all of Assignor's present and future right, title and interest in and to the following, unless otherwise specified (collectively, the "<u>Assigned Assets</u>"):

(i)     all patent applications and patent rights, as well as all reissues, divisionals, continuations and continuations-in-part thereof, any corresponding foreign patent rights and any other patents issuing thereon or claiming priority therefrom, that relate to the Field or to aqueous or oil/fuel based emulsions (collectively, all of the foregoing being the "Patent Rights"). Without limitation, the patents and applications specifically identified on Exhibit 2.1(i) are Patent Rights;

(ii)     any common law and registered trademarks and unregistered trademarks, logos, service marks, trade dress and trade names, and all associated goodwill, and all applications, registration certificates, Section 8 affidavits, renewals, investigations, search reports, histories and other documents that relate to the Field or to aqueous or oil/fuel based emulsions or files subject to the Exclusive License (the "Trademarks");

(iii)     all copyright registrations and applications used or held for use by Assignor and any other non-registered copyrights or copyrightable works that relate to the Field or to aqueous or oil/fuel based emulsions (collectively, the "Copyrights");

(iv)     all technical information and know-how, confidential and non-confidential, that relates to the Field, including all computer software, patterns, plans, designs, research data, trade secrets, formulae, drawings, instructions, manuals, data, records and other documents relating to the foregoing (collectively, the "Know-How,")(the Know-How, Copyrights, Trademarks and Patent Rights are referred to collectively as the "Intellectual Property Rights"). Specifically transferred is all Know-How that relates to aqueous or fuel/oil based emulsions.

(v)     all license agreements, including the Exclusive License, assignments of inventions and other agreements which relate to the Intellectual Property Rights;

(vi)     all restrictions on competition and obligations regarding confidentiality pertaining to the Intellectual Property Rights imposed on third parties by Assignor; and

(vii)     all rights to enforce, claims, credits, causes of action, and rights to damages, profits or set-off whatsoever, whether known or unknown, relating to the Intellectual Property Rights.

(b)    The "Further Assurances" clause, paragraph 2.5, shall be replaced in whole as follows:

2.5    <u>Further Assurances</u>.  From and after the date hereof, Assignor shall from time to time, at the request of Assignee and at Assignee's cost, execute and deliver such other instruments of conveyance, assignment and transfer as Assignee may reasonably request in order to more effectively consummate the transactions contemplated herein and to vest in Assignee good and marketable title to the Assigned Assets.  Assignee shall be responsible for preparing such instruments of conveyance, and for recording the same, including paying any and all costs incurred in connection with such activities.  Assignor shall cooperate in any reasonable arrangement to the end that Assignee shall be provided the full use and benefits of such Assigned Assets as contemplated by this Agreement.

(c)    The "Disclosure" clause, paragraph 4.2, shall be eliminated and replaced with the following:

4.2    <u>This paragraph is intentionally left blank</u>.

(d)    The "Assignment" clause, paragraph 6.5, shall be replaced in whole as follows:

6.5    <u>Assignment</u>.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representative, successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned (whether voluntarily, involuntarily, by operation of law, or otherwise) by Assignor without the prior written consent of the Assignee or the Assignee's assigns.

(e)    Amend Exhibit 2.1(i) as follows: (1) <u>delete</u> the following patent application from the list of Patent Rights

| 10/114,426 | US | Diesel Fuel Recycling System and Apparatus to Reduce Vapor Emissions of Diesel Fuel | 01/09/2003 |

(2) <u>add</u> the following patent application to the list of Patent Rights:

| 10/659,046 | US | Method for Manufacturing an Emulsified Fuel | To be filed (actual filing date 9/9/03) |

## SECTION 3

3.    TRANSFER AND ASSIGNMENT OF INTELLECTUAL PROPERTY RIGHTS

3.1.    _Transfer and Assignment of Gunnerman Assignment Agreement._ Subject to the terms and conditions of this Agreement, Capital hereby assigns, transfers, conveys and delivers to Talisman, free and clear of any mortgage, lien, pledge, option, security interest, claim, charge or other encumbrance of any kind whatsoever, whether or not of record, all of Capital's present and future right, title and interest in and to Capital's rights under the Gunnerman Assignment Agreement, as amended.

3.2.    Subject to the terms and conditions of this Agreement, Capital hereby assigns, transfers, conveys and delivers to Talisman, free and clear of any mortgage, lien, pledge, option, security interest, claim, charge or other encumbrance of any kind whatsoever, whether or not of record (other than the Exclusive License) all of Capital's present and future right, title and interest in and to Intellectual Property Rights, including Capital's: (a) rights in any Patent Rights arising after the execution of the Gunnerman Assignment Agreement; and (b) right to sue and recover damages for (i) past infringement of Intellectual Property Rights and (ii) breach of license agreements.

3.3.    _Purchase Price._ Subject to the terms and conditions of this Agreement, in reliance on the representations, warranties and agreements of Capital contained herein, and in consideration of the transfer and assignment of the amended Gunnerman Assignment Agreement and the Assigned Assets, Talisman has paid Capital good and valuable consideration, including

{B0294543.1}                                    5

the sum of One Dollar ($1.00) by check upon execution of this Agreement (the "Purchase Price"), the receipt and sufficiency of which is hereby acknowledged.

3.4.    Deliveries by Capital.  Upon execution and delivery of this Agreement, Capital will deliver to Talisman, at Talisman's cost, such instruments of conveyance, transfer and assignment as shall be prepared by Talisman to transfer to and vest in Talisman good, valid, and marketable title to the Assigned Assets (the "Assignment Documents").

3.5.    Further Assurances.  From and after the date hereof, Capital shall from time to time, at the request of Talisman and at Talisman's cost, execute and deliver such other instruments of conveyance, assignment and transfer as Talisman may reasonably request in order to more effectively consummate the transactions contemplated herein and to vest in Talisman good and marketable title to the Assigned Assets.  Talisman shall be responsible for preparing such instruments of conveyance, and for recording the same, including paying any and all costs incurred in connection with such activities.  Capital shall cooperate in any reasonable arrangement to the end that Talisman shall be provided the full use and benefits of such Assigned Assets as contemplated by this Agreement

## SECTION 4

4.    MISCELLANEOUS PROVISIONS

4.1.    Amendment and Modification.  Subject to applicable Law, this Agreement may be amended or modified by written agreement of the parties hereto.

4.2.    Waiver of Compliance: Consents.  Any failure of a party to comply with any obligation, covenant, agreement or condition herein may be expressly waived in writing by the party entitled hereby to such compliance, but such waiver or failure to insist upon strict compliance with such obligation, covenant, agreement or condition shall not operate as a waiver

of, or estoppel with respect to, any subsequent or other failure. No single or partial exercise of a right or remedy shall preclude any other or further exercise thereof or of any other right or remedy hereunder. Whenever this Agreement requires or permits the consent by or on behalf of a party, such consent shall be given in writing in the same manner as for waivers of compliance.

4.3.    No Third Party Beneficiaries. Nothing in this Agreement shall entitle any person or entity (other than a party hereto and his, her or its respective successors and assigns permitted hereby) to any claim, cause of action, remedy or right of any kind.

4.4    Notices. All notices, requests, demands and other communications required or permitted hereunder shall be made in writing and shall be deemed to have been duly given and effective as provided in the Purchase Agreement.

4.5    Assignment. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and permitted assigns.

4.6    Counterparts. This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

4.7    Headings. The table of contents and the headings of the sections and subsections of this Agreement are inserted for convenience of the parties only and shall not constitute a part hereof.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed, and made effective as of the day and year first above written.

_____
Rudolf W. Gunnerman

CAPITAL STRATEGIES FUND, LTD.

By:  Westford  Asset  Management  LLC-
Investment Manager

By:  _____
Name:  Steve G. Stevanovich
Its:     President

TALISMAN CAPITAL TALON FUND, LTD.

By:  _____
Name:
Its:

# EXHIBIT 7

## NOTE PURCHASE AGREEMENT

This Note Purchase Agreement (this "Agreement") dated as of April 23, 2003, is made by and between RUDOLF W. GUNNERMAN, an individual resident of the County of Washoe, Nevada ("Seller"), and CAPITAL STRATEGIES FUND, LTD. (the "Purchaser").

## RECITALS

A.   Seller has extended various loans to Clean Fuels Technology, Inc., a Delaware corporation (the "Company"), against promissory notes issued by the Company from time to time (the "Prior Notes"), which as of the date hereof totaled $16,425,150.21 in principal and $4,097,087.43 in accrued interest (the "CFT Loans"). The CFT Loans are all of the indebtedness of the Company to Seller. All of the Prior Notes and the CFT Loans are unsecured indebtedness of the Company.

B.   Seller has this day exchanged the Prior Notes for a single consolidated note (the "Note") in the principal amount of $20,522,237.64, evidencing all amounts owed with respect to CFT Loans.

C.   Seller wishes to assign to Purchaser all of Seller's interests and rights in the Note.

NOW THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Seller and Purchaser hereby agree as follows:

Section. 1.   Assignment and Purchase of Note. Subject to the terms and conditions and in reliance upon the representations and warranties herein set forth, Seller agrees to sell to Purchaser and Purchaser agrees to purchase, as of the date hereof (the "Closing Date"), the Note for a purchase price of $2,200,000.

Section. 2.   Delivery. Delivery of the Note shall be made at the offices of the Company on the Closing Date, against payment of the purchase price therefor in immediately available funds by credit to an account designated by or on behalf of the Seller. The Note shall be delivered to Purchaser, endorsed by Seller to the order of Capital Strategies Fund, Ltd.

Section. 3.   Representations and Warranties of the Seller. The Seller represents and warrants to, and agrees with, you that:

a.   The Recitals above are true and correct in all respects.

b.   Any and all loans made by the Seller to the Company other than the CFT Loans have either been repaid by the Company in full or have been converted into shares of common stock of the Company pursuant to agreement between the Seller and the Company. Following the sale and delivery of the Note to the Purchaser, the Company shall not be indebted to Seller.

c.   No relative, spouse, spouse of a relative or other "affiliate" (as defined below) of Seller (i) has made any loans to the Company that are presently outstanding, or (ii) other than Peter W. Gunnerman with respect to his Employment Agreement, dated

July 1, 1999, as amended, is owed any money by the Company. "Affiliate" shall mean a person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with the Seller, and shall include The Doris Gunnerman 1999 Grantor Retained Annuity Trust (the "Trust").

Section. 4.    Conditions of Purchaser's Obligation. The obligation to purchase and pay for the Note on the Closing Date shall be subject to the accuracy of the representations and warranties of the Seller herein, to the performance by the Seller of its obligations hereunder and to the following additional conditions:

a.    Support Agreement. Seller shall have delivered to Purchaser a Support Agreement in the form attached hereto as Exhibit A, executed by the parties thereto.

b.    Termination and Release. Seller shall have delivered to Purchaser and the Company a Termination and Release in the form attached hereto as Exhibit B, executed by the parties thereto.

c.    Technology Transfer and Assignment Agreement. Seller and Purchaser shall have entered into a Technology Transfer and Assignment Agreement, of even date herewith, which provides for the assignment of all patents issued and pending that are licensed to the Company under that certain Exclusive License dated January 3, 1994, from Seller to A-55, L.P., as amended, together with all of Seller's rights related to such patents and an assignment of the Seller's rights under the same Exclusive License.

Section. 5.    Miscellaneous. This Agreement is to be governed by, and construed in accordance with, the laws of the State of Delaware. It may be executed in two or more counterparts, each of which when so executed and delivered shall be an original, but all of which together shall constitute one and the same instrument. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, successors and assigns. This Agreement supersedes all prior agreements and understandings (other than the instruments described in Section 4 hereof) relating to the subject matter hereof. Neither this Agreement nor any term hereof may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought. In case any provision in this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby. The headings in this Agreement are for purposes of reference only and shall not limit or otherwise affect the meaning hereof.

[Signature page follows.]

2

IN WITNESS WHEREOF, this Agreement is hereby executed as of the date first written above.

SELLER:

_____
Rudolf W. Gunnerman


PURCHASER:


CAPITAL STRATEGIES FUND, LTD.

By:   Westford   Asset   Management   LLC-Investment
Manager

By:      _____
Name:   Steve G. Stevanovich
Its:     President


[Signature page to Note Purchase Agreement between Rudolf W. Gunnerman, as seller, and Capital Strategies Fund, Ltd., as purchaser]

3

IN WITNESS WHEREOF, this Agreement is hereby executed as of the date first written above.

SELLER:

_____

Rudolf W. Gunnerman

PURCHASER:

CAPITAL STRATEGIES FUND, LTD.

By:   Westford   Asset   Management   LLC-Investment
Manager

By: _____

Name:  Steve G. Stevanovich

Its:   /President

[Signature page to Note Purchase Agreement between Rudolf W. Gunnerman, as seller, and Capital Strategies Fund, Ltd., as purchaser]

2

## CERTIFICATE OF SERVICE

I, Seth Reidenberg, hereby certify that on May 15, 2006 a copy of the foregoing document was caused to be filed and served pursuant to the District Court rules regarding filing procedures upon the following counsel of record:

<u>Via Hand Delivery</u>
Kurt Heyman, Esquire
Proctor and Heyman LLP
1116 West Street
Wilmington, DE 19801

<u>Via email</u>
T. Michael Guiffre, Esquire
mguiffre@pattonboggs.com
Patton Boggs, LLP
2550 M. Street, NW
Washington, D.C. 20037

Seth Reidenberg (No. 3657)